# SUPREME COURT OF FLORIDA,

## APRIL TERM, 1872.

IN THE MATTER OF THE EXECUTIVE COMMUNICATION FILED
THE 17TH DAY OF APRIL, A. D. 1872.

1. The Governor may require the Justices of the Supreme Court to give their opinion as to the intepretation of any portion of the Constitution, or upon any point of law. The Governor when impeached is deemed under arrest, and is disqualified from performing the duties of his office, and such duties devolve upon the Lieutenant-Governor until "acquittal by the Senate." The term acquittal signifies any affirmative *final action by the Senate*, other than a conviction, by which it dismisses or discontinues the prosecution.
2. The Governor when impeached cannot require an opinion of this Court upon such questions so long as such impeachment is pending. If, however, he makes such a demand, this Court must examine the question to the extent of determining whether there has been an acquittal, because, in the event there has been, they must deliver the opinion.
3. Whether the action of the Senate in a case of impeachment is of such character *as to entitle the defendant* to a discharge, is a question which the Senate can alone determine with effect. This Court does not administer the law of impeachments, and even if it should deem the officer *entitled* to a discharge, it could not order a discharge, and the officer is suspended until the *Senate discharges him* from the impeachment. The Senate has the sole and exclusive jurisdiction to try all impeachments, and this Court cannot wrest a case from its jurisdiction and administer what it deems to be the law of that jurisdiction.
4. When an officer has been impeached by the Assembly, the adjournment of the Senate until the next regular session, and its failure to dispose of or act upon a motion to discharge the prisoner, is not an acquittal by the Senate within the meaning of the Constitution, although the term of office may expire with the meeting of the next regular session.

WESTCOTT, J., delivered the opinion of the Court.

Sec. 16, Art. V, of the Constitution of this State provides that the " Governor may at any time require the opinion

of the Justices of the Supreme Court as to the intepretation of any portion of this constitution or upon any point of law, and the Supreme Court shall render such opinion in writing."

We have received the following communication from His Excellency the Governor :

*To the Honorable the Chief Justice of the Supreme Court and the Associate Justices thereof :*

In view of the present and prospective difficulties arising out of the conflicting claims between myself, as the elected Governor of the State, and Samuel T. Day, as Lieutenant-Governor thereof, as to the right to exercise and perform the duties pertaining to the office of Governor, I beg leave to submit for your consideration—

That during the session of the Legislature of the State of Florida, at its regular session in 1872, I was Governor of said State, and such proceedings were had by the said Legislature through the Assembly and the Senate, that I was impeached of high crimes and misdemeanors, malfeasance in office, and conduct detrimental to good morals ; that therefore I was suspended, under the constiution of the State, from the performance of the duties of the said office of Governor ; that the Senate thereafter fixed a day on which it would resolve itself into a High Court of Impeachment for my trial; that the day fixed was duly notified to the Assembly ; that on the day so fixed said Senate did so resolve itself into such court ; that the Assembly, by its managers and counsel, appeared in due time, presented charges and specifications, to which I, as respondent, pleaded, and to which plea, the Assembly, by its managers and counsel, replied ; and that issue being joined, the managers, by their counsel, applied to the court for continuance of the trial of said charges, for cause shown; that I, by my counsel, declared myself ready for and demanded a trial, and protested against such continuance.

Thereupon, by a vote of said court, it refused so to continue said trial to a future day ; that thereafter, pending discussion as to what action the court would take in relation to the said trial, motion was made by a member of said court that said court adjourn, which motion was carried, and the Chief Justice of the Supreme Court, who was then and there presiding over said court, declared said court adjourned ; that in virtue of said action, believing that any disability to perform the duties of Governor as aforesaid was fully removed, I have issued my proclamation, under the great seal of the State, have assumed the duties of said office, and performed acts, and been recognized by some of the officers of my Cabinet as such Governor ;

That I caused to be forwarded to said Day a proposition to submit the whole question to your honors, that without hindrance or delay it might be judicially known to the good people of the State who could or should of right perform the duties of said office ; but that said Day declined to appeal to the courts, and declared that he would maintain his place as Acting-Governor of said State by force ;

That such refusal and threat endangers the peace and dignity of the State, and delays the proper and due administration of the State government.

These facts submitted, I beg you will advise me in the premises, that the people may act in accordance therewith, in this :

Did the action of the said High Court of Impeachment remove the disabilities growing out of suspension from power to perform the said duties, and restore and reinstate me in the powers and duties properly pertaining to said office, particularly in view of said proclamation and assumption thereof ?

I have the honor, etc.,

HARRISON REED,
*Governor of Florida.*

The question presented for our consideration is whether his Excellency Harrison Reed, Governor of Florida, is at this time in contemplation of law " deemed under arrest " and " disqualified from performing any of the duties of his office." We are obliged to determine this question in order to ascertain whether he has a right to demand our opinion, as well as whether it is our duty to give it.

The Constitution (Art. IX, Sec. 16,) declares that any officer when impeached by the Assembly shall be in that condition, but any officer so impeached may demand his trial by the Senate within one year from the date of his impeachment. His Excellency Harrison Reed, Governor of Florida, was impeached at the late session of the Legislature, (January, 1872.) This is admitted by the communication now before us, and it is shown by the journals of the House of Assembly and the Senate for that session. The consequence of that impeachment was 'to disqualify him from performing the duties of his office. The suspension consequent upon the impeachment can cease to exist under the constitution, if it ceases at all, but in one way—which is acquittal by the Senate—for whatever may be the effect of the expiration of one year from the impeachment and demand for trial, that time has not elapsed, and for that reason the construction of that clause of the constitution is not here involved. In the language of the constitution, the officer " shall be disqualified from performing any of the duties of his office *until acquittal by the Senate.*" The only event then which could have operated in this case to restore this officer to his powers, must have been *an acquittal by the Senate.* The simple question then presented for our consideration is, has there been *an acquittal by the Senate ?*

What is the true intent and meaning of the word acquittal as here used in the constitution ? The court does not differ as to the proper definition of this term. It is our unanimous opinion that it is not restricted to an actual judgment of acquittal after vote, upon full evidence failing

to convict, by a requisite two-thirds of the members of an organized Senate. We think its true signification embraces any affirmative final action by a legal Senate other than a conviction, by which it dismisses or discontinues the prosecution. Any final disposition of the impeachment matter by the Senate, the Chief Justice presiding, other than a conviction, is therefore an acquittal *for the purpose of removing the disqualification from performing the duties of the office.* Whether it is effective for any other purpose, is not here involved.

The only question, therefore, which remains to be considered to dispose of this very elaborately argued subject is, *has the Senate made any such final disposition of this impeachment?* This is a very plain, simple question, to be determined by an examination of the journal of the proceedings of the court and the Senate on the last day of the session of the Court of Impeachment.

It appears from the record of the proceedings of the court on that day, that the counsel for the respondent moved that the plea in the case before that time filed be held and treated as the answer to the articles of impeachment filed subsequent thereto. This was adopted. Then followed the replication to the plea. A resolution was then offered that the court adjourn in accordance with a concurrent resolution of the Assembly and Senate for their adjournment on that day. This was not adopted. The respondent then filed a protest against further delay, and especially against delay or continuance until an impossible day or time within which the office of Governor shall have expired. After which he moved that the court require the managers to proceed with the evidence, or that he be acquitted and discharged. This motion the record does not disclose was acted upon. An order was then offered by a Senator that the court adjourn. The record states that this order was adopted, but this could not have been the case as there were further proceedings. Then follows an offer of an order by a Sen-

ator as a substitute, (for the previous motion to adjourn, we suppose,) that the court sit from day to day, at 10 o'clock of each day, for the trial of the respondent. It does not clearly appear whether this was adopted, but we deem it immaterial whether it was or not in the view we take of the subject. Then follows a motion to adjourn, and an adjournment in general words specifying no time. On the same day, at 12 M., the Senate, on motion, adjourned *sine die*, or in other words adjourned for the session and until the period fixed by the constitution for the next session of the Senate.

It appears, therefore, that the court, after failing to act upon a motion to acquit and discharge the prisoner, simply adjourned, and that the Senate at 12 M. of the same day adjourned for the session. In view of this record, it is plain, therefore, that the court made no final disposition of the case, but simply adjourned. The case is, therefore, still pending in that court. A case is pending if it is not finally disposed of, and clearly here is no final disposition of it by any order of the Senate so doing. On the contrary, the record shows that a motion to discharge was pending at the time of adjournment.

But it is insisted that this action by the Senate entitled the respondent to his discharge, and that in contemplation of law it was equivalant to his discharge. Now, if the Senate is the sole authority to discharge—if it is the only tribunal that can discharge—then it is plain that it is the only authority that can act in the matter. *Whether a prisoner is discharged from the custody of a court or from an indictment, is a fact to be determined by a simple inspection of the record. If there is no order to that effect, then there is no discharge, and if, as in this case, there is nothing in the record discharging the respondent, the simple result is that the Senate has not discharged him.*

It is proper to inquire here whether we have any legal right or power to determine what the effect of this action is under the circumstances. If we have not; if it shall be,

as we conceive it is, the exclusive and sole province of the Senate to determine that question; if by so doing we usurp a jurisdiction not vested in this court by the State Constitution and wrest a case now pending from a court of exclusive jurisdiction over the trial of the subject, and presume to review its action and discharge what we may conceive to be its duty, it is plain that such action is improper.

Let us compare the powers and functions of the Senate in this matter with the power of this court. What is the Senate when organized for the purpose of trying impeachments? What is the extent of its jurisdiction, and what relation exists between this tribunal and that? The Senate, when thus organized, is unquestionably a court—because it is a body invested with judicial functions; because it determines issues both of law and fact; because it announces the law in the form of judgment, and through that instrumentality adjudges the penalties named by the Constitution. Not only is it a court, but it is a court of exclusive original and final jurisdiction. Its judgments can become the subject of reversal or review in no other court known to the Constitution and the laws. This simple exercise of judicial functions, the application of law to facts and announcing its conclusions, are not extraordinary or transcendent powers. Nor is the simple fact that its jurisdiction is both original and final a circumstance which alone would justify us in ascribing to it any extraordinary degree of importance, because the general reason why a court has both original and final jurisdiction is the small degree of importance of the matter involved. Not only is this tribunal a court, but it is a court of great importance. Its jurisdiction is not indeed very extensive as to the number of the subjects-matter which may come under its control, but the sphere in which it acts, while limited to but one class of cases, is most high and transcendent. This is so because of the subject-matter of its jurisdiction, the degree and extent of the punishment it imposes, and the exclusive power which it

has of regulating its practice arising upon any matter pending before it. All other persons in whom judicial power is vested under the Constitution derive their existence from a delegated power to the Governor or Governor and Senate. These persons represent the people directly through the exercise of the elective franchise. Not only are they thus clothed with judicial powers, but they constitute one branch of the Legislature, and are a part of the law-making power. While thus it is a court, it is none the less the Senate, for the Constitution declares that "*all impeachments shall be tried by the Senate.*" One class of politicians have contended that it is a Senate and not a court; another class that it is exclusively a court. It is in fact both. This, the Supreme Court of the State, exercises its highest and most transcendent jurisdiction through the instrumentality of the perogative writs of mandamus, prohibition and *quo warranto.* Through them we control inferior courts and officers, superintend corporations and protect the offices of the people from usurpation. We may oust an usurper because he was not elected or eligible, and there our power ends. This Court of Impeachment and the Assembly go further. To them the people have confided the superintendence and control of all persons who are invested with distinguished political franchises and offices. This court can say to an officer, you are not elected or qualified. That court can say to him, we admit that you are selected by the people; that you were in all respects qualified, and notwithstanding all this, you shall not only no longer discharge the functions and franchises of a particular office, but you shall not hold in the future any office of honor, trust or profit under the State. Under these circumstances, we submit that we should and must be very careful how we act in such matters. This jurisdictson is too high and transcendent to be invaded.

In the argument of this case, allusions were made to the rule that the different departments of the government must keep within their several constitutional spheres of action.

The conflict here threatened is not between co-ordinate departments of the government. It is between two courts of high and transcendent jurisdiction. We having no jurisdiction of the subject-matter of impeachment, propose to discharge an impeachment proceeding because we conceive that the legal effect of certain action taken in the court having exclusive jurisdiction of the subject is to entitle the party to a discharge. Suppose we test the question of jurisdiction by bringing the matter to a contest. Suppose we say in this instance to Gov. Reed that the legal effect of this action is your discharge and you are entitled to enter upon the duties of your office. Suppose the Senate meets tomorrow and determine for themselves that they have not in fact discharged the prosecution and they have done nothing which in law entitles him to a discharge; that upon their calendar the case is still pending and they propose to proceed to the trial. Is it not perfectly clear that if the Senate has the exclusive jurisdiction of the case, its judgment and not ours must prevail? We think there can possibly be no doubt here.

But it is not insisted that the court in which these proceedings transpired has gone out of existence and there is no court that can try the case. The effect of its action was likened in argument to the effect of a dissolution of Parliament, and it was urged that new members were to be elected to the Senate for its next session; that some of the Senators already sworn on the Court would cease to be members of the Senate, and other persons would be elected to fill their places.

We enquire, then, did the court cease to exist with the late session of the Legislature? It is insisted that it did cease to exist because of the adjournment and the necessity for electing new Senators before the next session. To this proposition no member of the court accedes. So long as there is a Senate there is a court. If the Senate was abol-

ished and the impeachment causes then pending before it not transferred to some other tribunal as its successor for trial, then we would have a different question for solution. But that is not the case. Because Senators may die or change, the Senate does not cease to exist nor do its functions as a court cease. The court co-exists with the Senate. Because the Judge of a Circuit Court may die, the Circuit Court does not cease to exist as a tribunal known to the constitution. A court is one thing, and the judge of the court is another. The abolition of the court does not follow from a vacancy in the office of the judicial officer that presides in it; the death of each officer composing this court, between the regular terms appointed for its sitting, would not a work a discontinuance of any cause now upon its calendar. If such a thing should occur in term, it would intercept and interrupt the actual business until other officers are appointed under the constitution; this would be the whole result. So far, therefore, as the tribunal is concerned, the Senate, like any other judicial tribunal, does not die or cease to exist with the adjournment of the session or term. Its business as a court is simply intercepted. All cases of impeachment pending and undisposed of at the preceding session remain upon its calendar or docket until *the Senate sitting as a court* enters an order finally disposing of each case. Much embarrassment in the consideration of ·this subject will arise if we make the Senate occupy to this matter the relation of a party, and conceive the idea that if the personal character of the Senate changes, the suit thereby is abated. We see really no necessity for going in search of any precedent to sustain so simple a proposition as this.

The argument, however, was pressed with such force that we must give it some consideration.

We need not go to impeachment cases pending in the House of Lords from year to year, from prorogation to prorogation, and from dissolution to dissolution of parliaments,

to establish this view. There are but two impeachment cases in the State of Florida. One of these presents a precedent to establish the proposition that an adjournment for a session and a change in the individual Senators composing the Senate did not destroy the court. In the matter of the impeachment of James T. Magbee, Judge of the Sixth Judicial Circuit of the State of Florida, the impeachment went over from one session to another. At the succeeding session, new members of the court were sworn, and this court thus organized acted upon the case. The court, therefore, still exists. The case is still pending. The Governor, as a necessary consequence, is suspended. But it is said that the proceedings had at the last session of the Senate *entitle him to a discharge.* We are not the court to determine that question in any form of proceeding. If we believed that he was entitled to a discharge, according to the practice in impeachment causes, our declaration to that effect could amount to nothing. That which enables him to resume the discharge of the functions of his office is his *discharge by the Senate, not his discharge by this court;* and any attempt on our part so to do, under the circumstances, would be a pure usurpation of authority. Chief Justice Marshall has well said that to usurp such authority is nothing less than treason to the Constitution.

We cannot determine the effect of this action of the Senate, and all that we have to do with the subject is to respect its judgment, whatever it may be, provided the punishment inflicted is not in excess of that named in the Constitution, and is authorized by it, and is the judgment of a legal Senate vested with jurisdiction of the subject-matter and of the person.

It appears to us to be a self-evident proposition that a case may still be pending in a court, a prisoner be still under arrest and in the custody of the officer, and yet the party be entitled to a discharge according to the principles of law applicable to the action of the court in his case. Take the case

of a prisoner entitled to his discharge because the jury has been discharged, for no good cause, without his consent. It certainly must be very plain to the most ordinary comprehension that he *is neither discharged nor acquitted in fact* until the court in which the case is pending so declares by its order. That is to say, a party may be entitled to a discharge and yet not discharged in fact. Now, what is it which, by the Constitution, suspends the officer? His impeachment. What is it that restores him to his functions? His acquittal. His acquittal by what power, by what tribunal? By this court? No. By what court, then? The Constitution is very plain on the subject. It says, *his acquittal by the Senate*—by the court which now has the case before it. Our only jurisdiction is to follow and enforce the Senate's final action and judgment, if constitutional. We would disregard it if it was otherwise; that is to say, in the absence of a decision of that question by the Senate, this court, even though it is satisfied what should be the *decision of the Senate* upon that question, and what the law applicable to it is, has no authority to determine the law with legal effect, and hence whatever may be our opinion as to what should be the rule, it is for that jurisdiction, not this, to declare it.

Our power in the matter of this impeachment is limited and circumscribed by the fact that it is a matter beyond our jurisdiction entirely. After an impeachment perfected according to the Constitution, the whole matter is with the Senate, and it has the exclusive right of determining all questions which may arise in the case. If its action is unconstitutional, we have the right and power to declare its nullity, and, in a proper case before us, to enforce the right of any party of which it proposed to deprive him.

A short review of the cases illustrating the comity of courts and showing the limitations upon the power of other courts, following from the fact that the jurisdiction of one court is being exercised over the subject-matter, will show

the course generally pursued where there is even concurrent jurisdiction over the same subject-matter. They will also show the effect to be given to the record of this Court of Impeachment if it was presented collaterally as evidence in a *quo warranto* or other proceeding. As a matter of course, it could only become the subject of examination in this court by way of evidence in a collateral manner, as we have no appellate jurisdiction as to this Court of Impeachment, nor indeed have we concurrent jurisdiction over the subjects of its power.

Chief Justice Marshall, in the case of Smith vs. McIvor, 9 Wheat., 532, says, in cases of concurrent jurisdiction, the court which first has possession of the subject-matter must determine it conclusively. We think, says he, that the cause must be decided by the tribunal which first obtains possession of it, and that each court must respect the judgment or decree of the other. In the case of Brooks vs. Delaplane, 1 Mar. Chy. Dec. 351, the chancellor says : " There is no instance in which either one of the English courts has attempted to hinder or stay any part of the proceedings in a suit which had been rightly instituted and was then progressing in another. This court has no more power to stay the proceedings of the county courts as courts of equity than have the latter courts to prohibit the proceedings in this, and if this court should now entertain jurisdiction of the subject-matter of the present controversy and proceed to decree the relief sought by the bill, there may and probably will be two decrees inconsistent with each other, each affecting the same persons. The only course of safety, therefore, is, when one court having jurisdiction over the subject has possession of the case, for all others with merely co-ordinate powers to abstain from any interference."

It is the natural consequence of an adverse decision in one court, during the progress of a trial, that a party should desire to have his case adjudicated in another, and hence parties very often improperly attempt to get the intervening

aid of another court when they are not entitled to it. We have at least one case in the Supreme Court of this State announcing the rule referred to, and there are probably but few Supreme Courts of the States which have not decided the question in the same way. If we leave cases which are civil in their character and look to the action of one court in reference to another, where the subject-matter to be affected is the personal liberty of the citizen, we will find that courts limit their action in reference even to this matter by the observance of like principles of comity, and by enforcing what they conceive to be such limitations upon their powers as are necessary to prevent conflicting adjudications upon the same subject-matter. Take the identical case which in argument the counsel presents as analagous in some respects to the proceeding of the Senate in this case—the discharge of a jury from rendering a verdict in a case of felony without the consent of the prisoner and for no sufficient cause in law. It is contended that this action is equivalent in law under certain circumstances to an acquittal, and the prisoner is entitled to his discharge without day from the indictment. Admit the correctness of this view for the sake of the illustration. Suppose the court adjourns for the term, leaving the person in the custody of the officer, without making any order in reference to the case, and the person is brought upon *habeas corpus* before a tribunal authorized to issue that writ, would the court discharge him? In 5 Ind. 290, the jury had been improperly discharged before verdict, so that the defendant could not be subjected to another trial, yet the court refused to discharge him on *habeas corpus* and said he must apply to the court in which the indictment was pending for relief.

There are quite a number of cases illustrating the same principle. In *ex parte* Walton, 2 Whart. 501, the statute authorized a discharge when the prisoner had not been tried at a second term. In such a case, upon *habeas corpus,* the court held that the power of discharging was confined to

the court in which he was indicted, and that although it was bound to allow the writ, yet that in such a case it would not look further than the commitment, if it was unexceptionable in the frame of it. This ruling was approved in the subsequent case of The Commonwealth vs. The Sheriff, 7 Watts & Serg. 108.

It is unnecessary to insert in this opinion extended quotations from the cases upon this subject. The principles of the following cases are similar to those just commented upon : 2 Green, 312 ; 4 McCord, 233 ; 1 Watts, 66 ; 8 Serg. & Rawl., 71 ; 6 McLean, 355 ; 2 Paine, C. R., 348 ; 10 Mass. 101 ; 3 Wis. 1 to 218. There are a few cases which do not fully sustain the doctrine above enunciated, but it deserves to be noticed, says a commentator who has given great attion to the subject, that in all these instances the power to interfere was exercised or asserted by a court not only superior to the court or officer under whose process the imprisonment was claimed, but having by its Constitution an appellate jurisdiction over such court or officer. Hurd on Hab. Corp., 351.

Before leaving the discussion of the cases upon the subject of *habeas corpus*, it may not be inappropriate to illustrate our view by an application of the principle to a hypothetical case. Suppose the Constitution provided for Governor Reed's actual instead of his constructive arrest. The record of the Court of Impeachment, as it is now presented, is filed with his petition praying a *habeas corpus* as an exhibit thereto, and the writ is awarded. Now, the customary rule in *habeas corpus* is to require notice of the application for or pendency of the writ in criminal cases to be served upon the public prosecutor where the imprisonment is under criminal process. This would be in this case the managers and counsel appointed by the House of Assembly. They would be entitled to be heard upon the matter before we pronounced judgment, for they prosecute in the name of the whole people. Under these circumstances, we submit that it would

be extremely strange and novel for the managers to appear before this court and ask of us, in the name of the people, not to discharge their impeachment which was then pending in the Senate, and to permit the Senate to determine for itself, in a case then pending before it and of which it had exclusive jurisdiction, whether something had been done in the progress of the trial up to that time which entitled the prisoner to an order discharging him, according to the law governing that forum in the matter of its exclusive jurisdiction upon the subject of impeachments.

These are cases in the ordinary common law courts, civil and criminal, illustrating the principle of comity between courts and the limitations upon the power of one tribunal, following from the fact that one court having taken jurisdiction of the subject matter, it has not finally disposed of it. They are referred to not as cases precisely analagous in all respects to the matter now under consideration, but only as illustrating the general subject. The matter here presented is one in which the jurisdiction is exclusive, not concurrent.

In what we have said we do not affirm the entire want of jurisdiction or power in this court in *proper cases* to investigate and inquire into any act of the Senate affecting the rights of parties before it in a case where what they have done comes before us collaterally. That power cannot be thrown off. But when the Constitution vests exclusive jurisdiction over impeachments in the Senate, we are deprived of the power of deciding questions arising in the course of the trial, or whilst the impeachment is pending, for these necessarily must belong to the court vested with the principal power or jurisdiction, and there is no appellate power in this court to reverse it. When, therefore, in exercising the power and jurisdiction vested in this court, we proceed to inquire into matters brought properly to our attention, the law does not authorize us to substitute our judgment for that of the Senate upon questions before that tribunal, and

hence, if it appears that no order finally disposing of the
case has been made by it, we are at once arrested by the
rule of constitutional law which affirms that the Senate it-
self is the only tribunal to decide whether, from the nature
of its own previous action, the party is entitled to a dis-
charge.

We do not contend that the action of the Senate cannot
be final without its express declaration to that effect. We
determine for ourselves whether that action was final. We
examine the record of the Court of Impeachment to ascer-
tain what it has done. Our jurisdiction and power to go
this far is clear, because this record is here presented to us
collaterally for examination, and we can thus examine as
evidence the record of any judicial tribunal. 3 How., 763.
After examination of this record of the impeachment, we
find the case still pending. Being in this condition, we say
it is for the Senate to make some final disposition of it. We
do not decline to interpret the action of the Senate or to
construe it. This we must do, in order to ascertain whether
it is our duty to answer the demands of the Governor. Hav-
ing ascertained that there is no such right in the Governor,
he being now suspended, we decline to say anything to him
upon the subject except that he is suspended, and to define
his relations as Governor to the Lieutenant Governor. If
the question here asked by the Governor had been asked by
the Lieutenant Governor, in whom the right to have our
opinion is now vested, it would have been our duty to have
stated whether Governor Reed was entitled to a discharge.
We would in this event have stated what the rule was, if
there were any precedents establishing a rule, or in case there
were no precedents, we would have stated what the rule
ought to be. But we must have declared even then that our
opinion could not have the effect of restoring Governor Reed,
and it would still leave the question open for determination
by the Senate. To illustrate our view. His Excellency,
Harrison Reed, on the 28th of January, 1869, inquired of

this court whether the election of Abijah Gilbert as United States Senator by the Legislature of this State was illegal and void. In reply the court said: "It appears to us that such election was irregular, but it is out of our power *to decide* that the election was illegal and void, that question being exclusively for the Senate of the United States. If the Senate determine that the election was valid, that is final, but until it is determined, its validity will remain an open question." 13 Fla., 688, 689. So in this matter, if Lieut. Gov. Day had required us to say whether Governor Reed was entitled to a discharge, we must necessarily have accompanied any statement we may have made with a protestation that the only power authorized to interpret the law with legal effect and give judgment was the Senate, and that until it did so act, the matter must remain an open question. In 4 Cranch, 241, Chief Justice Marshall said: "Upon principle it would seem that the operation of every judgment must depend on the power of the court to render that judgment, or in other words on its jurisdiction over the subject-matter which it has determined." In 1 Peters, 340, it was held by the Supreme Court of the United States, "that where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding in every other court. But if it acts without authority, its judgments and orders are regarded as nullities. They are not voidable but simply void." The Senate having exclusive jurisdiction over the subject of impeachment, to the extent that it must alone determine and decide whether the Governor is entitled to a discharge, a solemn judgment entered by this court discharging him would be absolutely void. There is no form of proceeding known to this court by which it can enter a judgment discharging Gov. Reed from a pending impeachment. Certainly, in a matter of this kind, where we render a simple advisory opinion, we could not restore him, even though we thought he was en-

titled to a discharge. We have no jurisdiction of the subject-matter, there is no case before us, and we never enter a judgment as a consequence of an advisory opinion in any case.

With these views, we can only say that until Gov. Reed is acquitted by the Senate, we cannot acquit him, and that during his suspension his power as Governor to demand our opinion upon any question of law ceases. We decline to say whether the law applicable to the proceedings of the Senate at its last session entitles him to a discharge. It would be improper in this court to go beyond saying that the Court of Impeachment is still in existence and must determine the matter. We should not suggest to that court how it should determine a question to come before it in a case now pending. With the circumstances reversed, we should not be very much obliged to that or any other tribunal should it suggest to us how we should determine a case pending before this court; and should it, unasked by us, give its views of the law of a case pending before this court, we should deem it a grave mistake as well as an improper interference. Being suspended, Gov. Reed's relation to us in this matter is no more than that of a citizen, and it would certainly be improper in us to give a voluntary opinion to a citizen upon a question of law, whether it was involved in a case pending in a court or not, and whether we had jurisdiction over the subject-matter or not.

---

The court directed that the foregoing opinion, covering the subject-matter of the communication, be filed; that a copy of the same, together with the following letter in reply to the communication of the Governor, be sent to his Excellency the Governor, and that a copy of the opinion be forwarded to the Lieutenant Governor:

SUPREME COURT OF FLORIDA, }
Tallahassee, April 29, 1872. }

His Excellency HARRISON REED,

Governor of Florida, Tallahassee, Fla. :

SIR : In reply to your communication of the 17th day of this month, we have the honor to state our conclusions as follows :

Your impeachment is still pending before the Senate, which is the only tribunal authorized to acquit you under the Constitution, and until you are acquitted or discharged by that tribunal, within the meaning of the Constitution, you are suspended.

It may be true that the action of the Assembly and Senate in the matter of your impeachment at the late session of the Legislature would entitle you to have the said impeachment proceedings dissmissed, and that *the Senate should discharge and acquit* you therefrom, but that is a question which can be legally determined by the Senate alone, that being the tribunal before which the matter is pending and the court which has over the entire subject-matter both exclusive original and final jurisdiction. Were you not suspended, we are inclined to think that it would be our duty in ordinary questions, notwithstanding the want of jurisdiction in this court over the subject-matter involved in any question you might ask, to indicate simply in an advisory manner what was the law of such a case. This, however, would not determine the question, and would have no legal effect. A case of this kind will be found in 12 Fla. Rep., 686, and to the action of the court there we refer as illustrating our view under such circumstances. Even if the case were one which might be adjudicated in this court, our opinion in this way is only advisory and would not directly affect individual rights or the legality of acts, and would not restore you to an office held and exercised by another. If it was the office you sought to recover, you would have to resort to the proper proceeding to oust the party.

Lieutenant Governor Day, however, is neither *de jure* nor *de facto* Governor. He is no longer Governor. He is Lieutenant Governor, exercising the functions of the office of Governor. You are still *de jure* Governor. In case of a contest between you and the Lieutenant Governor as to the right to exercise executive functions, if we were of the opinion that the law gave to his acts the same standing as acts of *de facto* officers, it would perhaps result that you being suspended and not restored could not require our opinion, that power of office like all others being suspended. In such a case, we are inclined to think that you would not be entitled to demand our opinion while there was an adverse party exercising the functions of the office of Governor, unless his acts in office and title to office were void.

In the present state of the impeachment proceedings against you, your power to demand our opinion is suspended. To give an opinion, under all the circumstances, we think, could be properly viewed by the Senate as unsolicited advice by this court upon a question ·which the Senate can alone determine.

A purely voluntary expression of an opinion by this court upon a subject of the greatest importance then pending before the Senate, might be calculated to embarrass its action and might perhaps be viewed as an impertinent suggestion as to its duty in the premises. Whether you are entitled to a discharge that court must determine.

With the earnest hope that the Senate may bring these proceedings to a speedy and just termination, we have the honor to be, with much respect,

Your Excellency's ob'dt serv'ts,

O. B. HART,

JAS. D. WESTCOTT, JR.,

*Justices of the Supreme Court of Florida.*

RANDALL, C. J., delivered the following dissenting opinion:

The communication of Governor Reed states a case purporting to be the case made by the record of proceedings of the Senate organized for the trial of his impeachment.

The case as found in the journal of the Senate does not differ essentially in any legal aspect from that stated by him.

The question presented is, what is the effect of the action taken by the Senate and Assembly upon the impeachment by the Honorable the Assembly, which was lately pending before the Senate, upon the personal and political rights of Governor Reed, and the political rights of the Legislature and the people?

The office and purpose of the process of impeachment, as was well stated by one of the counsel who appeared in behalf of the Lieutenant-Governor, is to provide that the State may not be degraded by a delinquent officer; and as well, as was stated by other counsel, that in this process neither the State nor any citizen should be deprived of any lawful right by the action of any branch of the government.

It was well urged that this court had no authority to sit in review of or to reverse or nullify the action or proceedings of the Senate. But it was not well said, in a legal sense, that the Senate was a body having a superior jurisdiction, because its powers comprehended a broader and more elevated plane, untrammeled by the severe rules and axioms of the common or statute law. If this be true, the modern theories of government and the forms of civil governments framed in the later periods, are but solemn complicated frauds, machines for the amusement and the impoverishment of the people. If all political and judicial supervisory power is lodged in one body of men, notwithstanding the establishments which all peoples have so reverently organized under written Constitutions, which in terms divide the

powers of government into several departments of magistracy, supposed to be created to perform the offices of adjustments and balances, then are such several departments mere cheats and shams, baubles and play-things invented to delude and ensnare.

If this be so, what need of any other department than a single body of men, or indeed a single human being, covered with tinsel, whose "ambrosial locks" and imperious nod may dispense all power and all justice, and command the obedience of all other men ; a government fashioned after that of heaven itself, but whose Mentor is a mere piece of crumbling pottery ?

On the other hand, the Senate, created by the written law of the people, like any other department or fraction, has such authority as is conferred by the law. It has not been supposed to be a tribunal higher than the executive or judicial branches of government. As a judicial body, it can act only upon the request of another branch called the Assembly. It has judicial jurisdiction of but a single proceeding. It cannot reverse or set aside the judgment of the Supreme Court or of a Justice of the Peace. It may, if the Assembly complain and prove, dismiss our members for violation of law, but it cannot prescribe our judgments. Neither department is utterly independent of or "above" the other. The Legislature, by the repeal of a law, may take from the courts the power to act in a given case depending upon the existence of the repealed act, but it cannot deprive the courts of the power to administer the existing law. It may pass an unconstitutional act, and no power can prevent its action, but it cannot enforce it, nor will the courts permit its enforcement; nor can the Legislature enforce any law without the aid of the judicial tribunals— neither is superior, neither is inferior.

The remarks addressed to the court by counsel concerning the higher or supervisory character of the branches of the Legislature, as judicial tribunals of which the courts may

stand in peculiar awe, cannot be considered otherwise than
as an argument that the proceedings of the Senate in such
capacity were beyond the *control* of any other tribunal.
This is not a question in the consideration of the matter now
under examination.

The simple question is, what is the necessary legal effect
and result of the action of the Senate and Assembly upon
the impeachment and trial of the Governor? I may further
remark that the proceedings of the Senate in this matter
are, unquestionably, beyond the control of this court, even
as the proceedings of the court are beyond the control of
the Senate. The respect which each body owes to itself
precludes the possibility of any interference by it with the
action of the other, or any invasion by either with the juris-
diction of the other. The final action of the Senate is to
be examined only for the purpose of ascertaining what
action it has taken and what results legally flow from such
action, to the end that such results may be declared. And
I venture to declare that this final action must he examined
with reference to the law governing the powers of the actor,
for, so far as the rights of others are concerned, even a leg-
islative or judicial body cannot violate the law so as to de-
prive the people or any one of them of rights intended to
be secured by law, without abrogating the principle under-
lying the whole fabric of republican institutions, that gov-
ernments are instituted among men for the protection of
men's rights; and the courts are organized as integral parts
of the government for the purpose of enforcing this protec-
tion.

The house of Assembly impeached the Governor, and by
virtue of the Constitution he stood bereft at once of the
Executive function, which at once devolved upon the Lieu-
tenant-Governor. The Governor yielded, and pleaded to
the charges.

The Senate by its first rule, its law adopted for the pur-
poses of the trial, resolved to continue in "session from day

to day, Sundays excepted, until final judgment shall be. rendered."

The Assembly declared itself not ready to prove the charges, by reason of the absence of testimony and witnesses.

The Senate, by a vote of eleven in the negative to nine, in the affirmative, rejected an order proposed by one of its members "that the Senate, sitting as a High Court of Impeachment, do now adjourn in accordance with the concurrent resolution adopted by the Senate and Assembly for the adjournment of the Legislature."

The Senate thus refused to postpone the trial as requested by the Assembly, and thus practically repeated the rule to proceed from day to day until final judgment.

The Governor demanded a trial, and protested that the trial should not be postponed to a time beyond the expiration of his term of office, and insisted that such postponement not only would deprive him of his right to a trial and his right to be heard in his defence, which was secured to him by the terms of the Constitution, but would deprive the Senate of the power to try him, as he would be out of office by the constitutional limitation of his term before the next meeting of the Legislature, and the power of the Senate, therefore, to give judgment would be gone; such postponement would leave nothing upon which a judgment could operate. Whereupon the Assembly not proceeding with the trial, the Senate sitting for the trial adjourned, and the Senate and Assembly forthwith adjourned without day.

Now the sole question is, what is the legal result and the legal effect upon the rights of all the parties affected? I cannot avoid the question by declining to answer upon the ground that the court cannot determine the regularity or review the action of the Senate in its judicial capacity. I would not decline such interference whenever it should be demanded from any source. Has the Senate taken such action that as to itself, and to Gov. Reed, and to the proceed-

ing, it must necessarily take any further action in the case, to bring it to a termination? Is its power over the case exhausted? If I understand the majority of the court, they decline to interpret this action of the Senate; and then, I think, they do proceed to construe it, differing with me as to our duty to declare our opinion of its legal effect.

They conclude that the proceedings had by the Senate were not final until so declared by that body, while my conclusions are that the action taken was final as to result and effect; and if the Senate consider the matter again it should come to the same conclusion, uninfluenced, however, by our opinions in the matter of its duty, of which it alone will judge.

I have had neither time nor inclination, nor is it material in my judgment, to comment upon the various authorities, legal and historical, relating to impeachment proceedings, upon the legal effect of the prorogation or dissolution of the British Parliament, for, according to the view I take of the case, I may agree consistently with the argument of the learned counsel who responded to the counsel of Gov. Reed. I deal only with the case presented and its peculiar circumstances.

I conceive that the analogy between the qualities and organization and powers of the House of Lords, and those of the Senate of this State, is utterly wanting in at least two important particulars. The points of departure may be discovered in the following statement: ·

1. The Senate in conjunction with the Assembly may adjourn and thus dissolve their session, and may thus cease to act and deprive themselves of the power to act in a legislative or judicial capacity, *of their own volition.*

The House of Lords is a court in its fundamental existence, having all the incidents and jurisdiction of a judicial tribunal at the common law; having power to try not only political but other offences, and to review the judgments and proceedings of all other courts; its judicial existence cannot

be divested or destroyed by its own action ; it cannot dispose of cases before it by its dissolution or adjournment ; it cannot dissolve itself ; like all common-law courts, its cases remain before it until it takes affirmative action ; it cannot terminate its own sessions by adjournment, but only by the command of the sovereign, and the sovereign cannot dismiss causes from its jurisdiction. Hence the prorogation or dissolution of the Parliament, being done in virtue of the royal command, a power not to be resisted in that respect, does not divest it of jurisdiction over pending causes, and an impeachment, being a proceeding against *the person*, survives every accident save the death of the accused. (I understand this to be the law of England, and I think that the death of the accused destroys from that moment all jurisdiction of the House of Lords or other criminal courts over the proceeding, and that such proceedings as were pending are from that moment abated.)

2. The impeachment before the House of Lords is a proceeding against the citizen and peer in his individual capacity for offences committed either in his official or personal capacity. The trial is the trial of an offender, and the judgment is that of a court, the highest in the kingdom, whose process issues to enforce its judgments, even to the taking of the life of the person convicted. It tries and convicts of murder and of larceny upon an impeachment, and as an appellate court it tries the rights of liberty and property, and pronounces and enforces its judgments and decrees at law and in equity.

The Senate can judicially try only upon impeachment, and it can try, not the citizen for commiting crime, but only an officer, as such, for the sole purpose of deposition from his office and eligibility. Its judgments can be enforced only by means of judicial process from the courts of law, construing and acting upon the judgment of the Senate as upon a law of the State.

One deposed from office by the judgment of the Senate

may be kept from office only by the courts, the power of the Senate being exhausted by the rendition of its judgment. But the judgment of the Senate even will not be enforced by the courts, if the judgment be not authorized by the law of the land, of which the courts cannot refuse to determine.

The Senate must have jurisdiction of the officer or it cannot try him. If the Senate postpone the trial to a day when the officer ceases to exist, it doth forthwith postpone and divest itself of jurisdiction over the matter charged, of power over the officer, of the power to render a judgment, and there is no other logical sequence, in my judgment, than that it postpones the case out of its jurisdiction, and so there is nothing further upon which the Senate or court can operate. In other words, the case is dismissed, gone out of existence so effectually that it cannot breathe again; no power can restore it, and the accused is discharged from the custody of the court.

It cannot be said with any degree of plausibility that the constitutional provision, that the officer impeached shall be " deemed under arrest and disqualified from performing any of the duties of the office *until acquitted* by the Senate," contemplates an acquittal only by a vote of " not guilty."

An *acquittal*, as I understand it, is a discharge by virtue of any action of the Senate whereby it refuses expressly or otherwise further to entertain the case or act upon it, or which places the cause beyond its reach, and by which it has no longer any power or authority to render a judgment upon the guilt or innocence of the officer.

The Senate has already established this as the correct interpretation, in the case of the impeachment of a high judicial officer of this State, by its vote that the prosecution be discontinued and the case dismissed. Upon this the officer resumed, without question, the duties of his office. If the constitutional provision referred to contemplates a vote of "not guilty," or any judgment upon the merits of the charges,

then is the judge of the Sixth Circuit still suspended, and incalculable mischief and wrong done to the people by his subsequent unauthorized action. I am of the opinion, and I submit that any action of the tribunal in question which precludes a further proceeding in the case pending before it, necessarily terminates the case as effectually as though it were dismissed in express words. It puts an end to the case absolutely, and necessarily discharges the party from the arrest.

The right to a trial on the part of the accused is as sacred as the right to try on the part of the accuser.

The power to suspend and postpone the trial and to resume it depends upon the jurisdiction. The right to arrest and suspend from office depend upon the power to give a trial and to convict or acquit. The Constitution contemplates a trial, and the power to try once gone, all the consequences of the accusation cease. A refusal to try is a refusal to convict.

Without denying the power claimed on the part of the House of Lords to proceed at its next session after a dissolution of the Parliament and to conclude any business begun and not concluded, and not denying the power of the Senate to adjourn and postpone the trial of an impeachment to a day when it may proceed to try the officer accused, it is my judgment that the postponement to a day when it will have no jurisdiction of the officer, is an absolute dismissal of the matter from the further consideration of the Senate, and a discharge of the accused must follow as a matter of law.

So concluding upon the premises stated, I must, upon my convictions of duty, say that, in my opinion, Governor Reed has the right officially to solicit the opinion of the court, whenever, after the adjournment of the Legislature, he saw fit to do so; that he had a lawful right after such adjournment to resume the power and proceed to the discharge of the duties pertaining to the Executive Department whenever he saw fit. Yet it was wise to address the constitutional

advisers of the Executive upon the matter before resorting to any measure which would have disturbed the peace of the community.

As my brethren have come to other conclusions as to their duty; have formed other opinions as to the status of the proceeding in question, or that the Senate alone can determine the effect of its action by an express declaration, while I regret to be obliged to differ from them, I am equally obliged, out of respect to the law, cheerfully to acknowledge that my conclusions are not legitimate, for so the court decides. And I respect its opinions, as all good citizens should, notwithstanding any differences of private judgment.