**[J-65A-C-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON JJ.**


| | |
|---|---|
| LARRY KRASNER, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF PHILADELPHIA<br><br><br>       v.<br><br><br>SENATOR KIM WARD, IN HER OFFICIAL CAPACITY AS PRESIDENT PRO TEMPORE OF THE SENATE; REPRESENTATIVE TIMOTHY R. BONNER, IN HIS OFFICIAL CAPACITY AS AN IMPEACHMENT MANAGER; REPRESENTATIVE CRAIG WILLIAMS, IN HIS OFFICIAL CAPACITY AS AN IMPEACHMENT MANAGER; REPRESENTATIVE JARED SOLOMON, IN HIS OFFICIAL CAPACITY AS AN IMPEACHMENT MANAGER; AND JOHN DOES, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE SENATE IMPEACHMENT COMMITTEE<br><br><br>APPEAL OF: REPRESENTATIVE TIMOTHY R. BONNER AND REPRESENTATIVE CRAIG WILLIAMS | : No. 2 EAP 2023<br>:<br>:<br>: Appeal from the Order of<br>: Commonwealth Court entered on<br>: December 30, 2022 at No. 563 M.D.<br>: 2022.<br>:<br>:<br>: ARGUED: November 28, 2023<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| LARRY KRASNER, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF PHILADELPHIA,<br><br>       Appellant<br><br><br>       v. | : No. 3 EAP 2023<br>:<br>:<br>: Appeal from the Order of<br>: Commonwealth Court entered on<br>: December 30, 2022 at No. 563 M.D.<br>: 2022.<br>:<br>: ARGUED: November 28, 2023<br>:<br>:<br>: |

SENATOR KIM WARD, IN HER OFFICIAL
CAPACITY AS PRESIDENT PRO
TEMPORE OF THE SENATE;
REPRESENTATIVE TIMOTHY R.
BONNER, IN HIS OFFICIAL CAPACITY AS
AN IMPEACHMENT MANAGER;
REPRESENTATIVE CRAIG WILLIAMS, IN
HIS OFFICIAL CAPACITY AS AN
IMPEACHMENT MANAGER;
REPRESENTATIVE JARED SOLOMON, IN
HIS OFFICIAL CAPACITY AS AN
IMPEACHMENT MANAGER; AND JOHN
DOES, IN THEIR OFFICIAL CAPACITIES
AS MEMBERS OF THE SENATE
IMPEACHMENT COMMITTEE,

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

        Appellees      :


LARRY KRASNER, IN HIS OFFICIAL
CAPACITY AS THE DISTRICT ATTORNEY
OF PHILADELPHIA



        v.


SENATOR KIM WARD, IN HER OFFICIAL
CAPACITY AS PRESIDENT PRO
TEMPORE OF THE SENATE;
REPRESENTATIVE TIMOTHY R.
BONNER, IN HIS OFFICIAL CAPACITY AS
AN IMPEACHMENT MANAGER;
REPRESENTATIVE CRAIG WILLIAMS, IN
HIS OFFICIAL CAPACITY AS AN
IMPEACHMENT MANAGER;
REPRESENTATIVE JARED SOLOMON, IN
HIS OFFICIAL CAPACITY AS AN
IMPEACHMENT MANAGER; AND JOHN
DOES, IN THEIR OFFICIAL CAPACITIES
AS MEMBERS OF THE SENATE
IMPEACHMENT COMMITTEE


APPEAL OF:  SENATOR KIM WARD

:   No. 4 EAP 2023
:
:
:   Appeal from the Order of
:   Commonwealth Court entered on
:   December 30, 2022 at No. 563 M.D.
:   2022.
:
:
:   ARGUED:  November 28, 2023
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## OPINION

**CHIEF JUSTICE TODD**

This case is a direct appeal and cross appeal from the Commonwealth Court's adjudication of a petition for review brought by Appellant Larry Krasner, the elected District Attorney of Philadelphia County ("DA"), in which he raised several legal and constitutional challenges to articles of impeachment ("Articles" or "Articles of Impeachment") seeking his removal from office. The Articles were in the form of a resolution passed by a majority vote of the Pennsylvania House of Representatives ("House") on November 18, 2022, and they were transmitted to the Pennsylvania Senate ("Senate") on November 30, 2022 — the final day of the 206th Session of the General Assembly. For the reasons that follow, we hold that the Articles became null and void upon the expiration of the 206th Session of the General Assembly on November 30, 2022, under Article II of the Pennsylvania Constitution, and, thus, the Senate of the 207th Session of the General Assembly is not empowered by that charter to conduct a trial on the Articles to determine if the DA should be convicted and removed from office under them. We therefore reverse the portion of the order of the Commonwealth Court which denied the District Attorney's application for summary relief on this issue.

### I. Factual and Procedural Background

In Pennsylvania's November 7, 2017 General Election, Larry Krasner was the Democratic candidate for District Attorney of Philadelphia County — our Commonwealth's most populous county — and, in that election, he was elected by its voters to hold that position, having received more than 74% of the total votes cast in that race.[1]

---

[1] *See* https://vote.phila.gov/resources-data/past-election-results/.

From 2019 to 2021, Philadelphia experienced a significant increase in the rate of violent crime, including the rates of homicide committed through the use of a firearm.[2] In 2021, when the DA ran for reelection, the escalation in violent crime in Philadelphia became a focal point of the campaign, with the DA's primary and general election opponents publicly attributing the increase in violent crime in Philadelphia to the manner in which the DA was performing the duties of his office, as well as his prosecutorial policies.[3] In his public responses, the DA disputed a causal linkage between his policies and the spike in violent crime.[4]

Ultimately, the voters of Philadelphia overwhelmingly chose to return the DA to office in 2021, as he garnered nearly 72% of the votes cast in the November 2, 2021 General Election.[5] On January 2, 2022, the DA was sworn in to begin his second term.

---

[2] During this same time period, other areas of our Commonwealth and the nation experienced similar increases. *See* Scott R. Kegler *et al.*, *Notes from the Field*: *Increases in Firearm Homicide and Suicide Rates — United States, 2019–2022*, U.S. Dep't of Health and Human Services, Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (Oct. 20, 2022) at 1149-50, *available at* https://www.cdc.gov/mmwr/volumes/72/wr/pdfs/mm7242a4-H.pdf; Robert Orth *et al.*, *Crime in Pennsylvania, Offense Statistics and Trends over 10 years*, 2013-2022, Pennsylvania Commission on Crime and Delinquency, *available at* https://www.pccd.pa.gov/Justice-Research/Documents/10Year%20PA%20Crime%20Trends.pdf.

[3] *See generally* Chris Brennan & Sean Collins Walsh, *Philly DA Larry Krasner beats primary challenger Carlos Vega by wide margin in closely watched race*, Philadelphia Inquirer (May 19, 2021), *available at* https://www.inquirer.com/politics/election/philadelphia-district-attorney-larry-krasner-wins-election-carlos-vega-20210519.html; Michael Tanenbaum, *Larry Krasner wins second term as Philadelphia district attorney, defeating Chuck Peruto*, Phillyvoice.com (Nov. 2, 2021), *available at* https://www.phillyvoice.com/election-results-2021-philadelphia-district-attorney-larry-krasner-chuck-peruto.

[4] *See generally* Samantha Melamed & Julia Terruso, *Philly elected Larry Krasner district attorney to reform the system. Here's what he did*, Philadelphia Inquirer (May 14, 2021), *available at* https://www.inquirer.com/politics/philadelphia-district-attorney-da-larry-krasner-first-term-election-20210514.html.

[5] *See supra* note 1.

On June 27, 2022, Representative Joshua D. Kail introduced H.R. 216 of 2022, a resolution creating a "Select Committee on Restoring Law and Order" ("Select Committee") empowered to "investigate, review and make findings and recommendations concerning: (1) The rising rates of crime, including, but not limited to, the enforcement and prosecution of violent crime and offenses involving the illegal possession of firearms, in the City of Philadelphia[;] (2) The use of public funds intended for the purpose of enforcing the criminal law and prosecuting crime in the City of Philadelphia[;] (3) The enforcement of crime victim rights . . . in the City of Philadelphia[; and] (4) The use of public funds intended for the purpose of benefiting crime victims . . . in the City of Philadelphia." H.R. 216, 2022 Gen. Assem., 206th Session. The Select Committee was also authorized by this resolution to, *inter alia*, make "[d]eterminations regarding the performance of public officials empowered to enforce the law in the City of Philadelphia, including the district attorney, and recommendations for removal from office or other appropriate discipline, including impeachment." *Id.* Further, the resolution granted to the chairperson of the Select Committee the authority to subpoena documents and witnesses on behalf of the committee. *Id.*

This resolution was referred to the House Judiciary Committee, reported out of that committee on June 28, 2022, and passed by the full House 114 to 86 on June 29, 2022.[6] Pursuant to the requirements of the resolution, the Speaker of the House appointed three Republican House members — Representatives John Lawrence, Torren Ecker, and Wendi Thomas, and two Democratic house members — Representatives Amen Brown and Danilo Burgos — to serve on the Select Committee, and designated Representative Lawrence to serve as its chairman. The Select Committee began its work on July 13, 2022.

---

[6] Legislative Journal-House, 206th Session of the General Assembly ("House Journal"), 6/29/22, at 797.

Subsequently, on August 8, 2022, the Select Committee issued a subpoena *duces tecum* to the DA requesting, *inter alia*, documents which the DA had in his possession regarding his investigation and prosecution of former Philadelphia police officer Ryan Pownall for a shooting incident involving David Jones, including the DA's complete case file, written documents "related or referring to the investigative grand jury proceedings," as well as transcripts of those proceedings. *See Krasner v. Select Committee on Restoring Law and Order*, 450 MD 2022 (Pa. Cmwlth.), Petition for Review, 9/2/22, Exhibit C. The subpoena additionally sought documents setting forth "positions or policies" of the DA relating to charging decisions, bail proposals, plea bargains, and sentence recommendations with respect to certain individuals and categories of crimes. *Id.*

In response, on August 22, 2022, the DA filed objections with the Select Committee asserting that the investigation: did not serve a legitimate legislative purpose; violated the separation of powers between the legislative and executive branches of government; improperly sought materials containing internal confidential work product that was privileged and also sought the disclosure of secret grand jury materials related to the Pownall investigation, the release of which was forbidden by law. The DA's objections also averred that, because the work of the Select Committee had, as its ultimate goal, his impeachment and removal from office, such purpose was improper because he was not subject to impeachment and removal by the General Assembly, and doing so would deny the constitutional rights of Philadelphia's citizens who had elected him to his position. *Id.*, Exhibit D. The Select Committee denied these objections by letter on August 24, 2022, in which it declined to withdraw the subpoena, and further indicated that it reserved the right to compel compliance through, *inter alia*, contempt proceedings. *Id.*, Exhibit E.

The DA next filed a petition for review in the Commonwealth Court on September 2, 2022. Therein, he renewed the objections he had made to the Select Committee, and

he requested that the Commonwealth Court quash the Committee's subpoena and prohibit it from issuing additional subpoenas of this nature, as well as issue an order enjoining its members from conducting "any investigation or performing any work authorized by H.R. 216." *Id.*, Petition for Review, at 40.[7]

While the DA's petition was pending before that tribunal, on September 13, 2022, the House voted 162 to 38 to hold the DA in contempt for failure to turn over the documents and materials it had requested.[8] Two weeks after that vote, the DA began providing documentation to the Select Committee regarding his policies and procedures.

Ultimately, the Select Committee, after receiving and reviewing this and other documentary evidence, conducting witness interviews, and holding two days of public hearings, produced a 63-page Second Interim Report. *See* Select Committee on Restoring Law and Order, Second Interim Report, 10/24/22, *available at* https://www.legis.state.pa.us/WU01/LI/TR/Reports/2022_0017R.pdf. ("Second Interim Report").

The Second Interim Report covered a number of subject areas. Principally, the report discussed: crime statistics in the City of Philadelphia and the DA's prosecution rate for firearms-related crimes and homicides; the personnel changes made by the DA after he assumed office; and the DA's implementation of new policies for the prosecution and sentencing of certain offenses and the use of cash bail for individuals accused of particular classes of misdemeanors and felonies. Second Interim Report at 20-51. The

---

[7] The Commonwealth Court never issued a final ruling on the merits of the DA's petition. After a series of responsive pleadings were filed by the Committee and the DA, on December 19, 2022 the DA voluntarily discontinued that action without prejudice. The DA cited as the basis for discontinuance his assertion that the Select Committee's subpoena *duces tecum*, as well as its authority to continue its investigative activities, terminated upon the adjournment of the General Assembly on November 30, 2022. *Krasner v. Select Committee on Restoring Law and Order*, 450 MD 2022 (Pa. Cmwlth.), Praecipe for Discontinuance, 12/19/22.

[8] House Journal, 9/13/22, at 995-96.

report also recounted the expert testimony it had received from Professor Bruce Antkowiak, who is a Professor of Law and the Director of the Program on Criminology, Law, and Society at St. Vincent College, Latrobe, Pennsylvania, regarding the legal and constitutional constraints on the discretion of an elected district attorney to determine the manner in which certain types of crimes will be handled by their office. *Id.* at 53-54. Additionally, the report noted criticism the DA had received from members of the judiciary in published opinions. *See id.* at 56-58. Finally, the report leveled additional criticism of the DA for what it termed his "refusal to cooperate" with the Select Committee's investigation by turning over the requested documents and, instead, commencing a lawsuit in the Commonwealth Court to quash the subpoena and stop the Committee's investigation. *Id.* at 63.

Ultimately, the report concluded:

> [A]ddressing the increase in crime in Philadelphia requires the cooperation and collaboration of all stakeholders who share in the responsibility of addressing public safety, including, but not limited to, joint efforts to create policies and programs that harmonize protection of the public and the avoidance of unjust results. The Select Committee is hopeful that its work has underscored this critical need and that such cross-office cooperation can and does result from its work.

*Id.* The report did not recommend impeachment of the DA, his removal from office, or any other disciplinary action against him.

The Select Committee voted 5 to 0 to send its report to the House, which, on October 24, 2022, formally accepted it by a vote of 189 to 11.[9] Two days later, on October 26, 2022, Representative Martina White introduced a resolution calling for the impeachment of the DA "for misbehavior in office; and providing for the appointment of trial managers." *See* H.R. 240, P.N. 3607, 206th Gen. Assem., Reg. Sess. This

---

[9] House Journal, 10/24/22, at 1125.

resolution recited many of the findings of the report, and it set forth two articles of impeachment seeking removal of the DA.

The first article was based on the assertion that

> District Attorney Krasner, by and through his failed policies and procedures, and throughout the discharge of his duties as Philadelphia's chief law enforcement officer, has been derelict in his obligations to the victims of crime, the people of the City of Philadelphia and of this Commonwealth. Under District Attorney Krasner's administration . . . his lack of proper leadership serves as a direct and proximate cause of the crisis currently facing the City of Philadelphia. These policies have eviscerated the District Attorney's Office's ability to adequately enforce the laws of this Commonwealth; endangered the health, welfare and safety of more than 1.5 million Pennsylvanians that reside in Philadelphia and the tens of millions of Americans who visit the City every year; and, have brought the Office of District Attorney into disrepute.

*Id.*

The second article sought the DA's impeachment and removal from office for alleged obstruction of the Select Committee's work by his response to the Committee's subpoena. The resolution was referred to the House Judiciary Committee. Thereafter, that same day, the House adjourned. House Journal, 10/26/22, at 1241-42.

On November 8, 2022, Pennsylvania held its General Election, and the voters elected 49 new members of the House of Representatives and 6 new members of the Senate.

The House subsequently reconvened on November 14, 2022. On November 16, 2022, H.R. 240 was reported out of the Judiciary Committee, and it was amended and passed 107 to 85 by a vote of the full House that same day. House Journal, 11/16/22, at 1279. The amended resolution, H.R. 240, P.N. 3634 ("Impeachment Resolution"), set

forth seven Articles of Impeachment, based on alleged acts of "Misbehavior In Office":

**Article I:** Dereliction of Duty and Refusal to Enforce the Law

* * *

**Article II:** Obstruction of House Select Committee Investigation

* * *

**Article III:** Violation of the Rules of Professional Conduct and Code of Judicial Conduct; specifically Rule 3.3 Candor Toward the Tribunal, Rule 8.4 Professional Misconduct, and Canon 2 of the Code of Judicial Conduct Impropriety and Appearance of Impropriety in the Matter of *Robert Wharton v. Donald T. Vaughn*

* * *

**Article IV:** Violation of the Rules of Professional Conduct; specifically Rule 3.3 Candor Toward the Tribunal, Rule 8.4 Professional Misconduct, and Canon 2 of the Code of Judicial Conduct Impropriety and Appearance of Impropriety in the Matter of *Commonwealth v. Pownall*

* * *

**Article V:** Violation of the Rules of Professional Conduct and Code of Judicial Conduct; specifically Rule 3.3 Candor to Tribunal, Rule 8.4 Professional Misconduct, and Canon 2 of the Code of Judicial Conduct Impropriety and Appearance of Impropriety in the matter *In re: Conflicts of Interest of Philadelphia District Attorney's Office (sic)* [244 A.3d 319 (Pa. 2020) (order)]

* * *

**Article VI:** Violation of Victims Rights

* * *

**Article VII:** Violation of the Constitution of Pennsylvania By Usurpation of the Legislative Function

Impeachment Resolution at 26-48.

The Impeachment Resolution also required the Speaker of the House to appoint a three-member committee, with two members from the majority party and one from the minority party, for the purposes of exhibiting the Articles to the Senate, and "on behalf of the House of Representatives to manage the trial thereof." *Id.* at 50. Thereafter, then-Speaker of the House Bryan Cutler appointed Republican Representatives Timothy Bonner and Craig Williams, along with Democratic Representative Jared Solomon, as Impeachment Managers ("Impeachment Managers").[10]

On November 29, 2022, the Senate adopted, by a vote of 29 to 21, S.R. 386, which established "special rules of practice and procedure in the Senate when sitting on Impeachment trials," S.R. 386, 206th Gen. Assem., Reg. Sess., which included, *inter alia*, the formation of an Impeachment Committee. *Id.* at 6-7. It also adopted, by a vote of 30 to 20, S.R. 387 — a resolution which directed the House to exhibit the Articles. S.R. 387, 206th Gen. Assem., Reg. Sess.; Legislative Journal-Senate, 206th Session of the General Assembly ("Senate Journal"), 11/29/22, at 1243-49.

Impeachment Managers formally exhibited the Articles to the Senate on November 30, 2022. Senate Journal, 11/30/22, at 1253-58. That same day, the Senate adopted a resolution, S.R. 388, directing: that an impeachment writ of summons be prepared for the DA; requiring service of the writ on the DA by the Sergeant-at-Arms of the Senate before December 7, 2022; setting a deadline of December 21, 2022 for the DA to file an answer to the writ; and requiring an impeachment trial to convene in the Senate on January 18, 2023. *See* S.R. 388, 206th Gen. Assem., Reg. Sess.; Senate Journal, 11/30/22, at 1259-60.

---

[10] Representative Solomon voted against the Impeachment Resolution, and he did not participate in the proceedings brought by the DA in the Commonwealth Court, nor did he oppose the relief sought by the DA therein. Representative Solomon is likewise not participating in this appeal.

On November 30, 2022, both the House and Senate concurrently adjourned *sine die* – that is, adjourned without scheduling a date certain on which to reconvene.[11] House Journal, 11/30/22, at 1317; Senate Journal, 11/30/22, at 1269. As a result, and as we explain further herein, under Article II, Sections 2 and 4 of the Pennsylvania Constitution,[12] the 206th Session of the General Assembly formally ended at that time.

After service of the Senate's writ of summons, the DA filed a petition for review in the Commonwealth Court's original jurisdiction on December 2, 2022 naming as respondents then-Interim President *Pro Tempore*, now-President *Pro Tempore* of the Senate, Senator Kim Ward ("Senate President"),[13] along with Impeachment Managers.[14] *Krasner v. Ward*, 563 MD 2022 (Pa. Cmwlth.), Petition for Review ("Petition for Review"). The Petition for Review sought declaratory relief based on three grounds: (1) the Articles, as a pending matter in the General Assembly, were rendered void upon the termination of the 206th Session of the General Assembly on November 30, 2022, and did not carry over to the 207th General Assembly, *id.* at ¶¶ 40-50; (2) the Pennsylvania Constitution

---

[11] The term *sine die* means "'without day,' and a legislative body adjourns *sine die* when it adjourns 'without appointing a day on which to appear or assemble again.'" *Creamer v. Twelve Common Pleas Judges*, 281 A.2d 57, 65 (Pa. 1971); *accord Scarnati v. Wolf*, 173 A.3d 1110, 1114 n.4 (Pa. 2017).

[12] These constitutional provisions state:

> Members of the General Assembly shall be chosen at the general election every second year. Their term of service shall begin on the first day of December next after their election.

Pa. Const. art. II, § 2.

> The General Assembly shall be a continuing body during the term for which its Representatives are elected. It shall meet at 12 o'clock noon on the first Tuesday of January each year.

Pa. Const. art. II, § 4.

[13] Senator Ward succeeded Senator Jake Corman to this position upon his retirement at the expiration of his legislative term on November 30, 2022.

[14] The petition also listed two members of the Senate Impeachment Committee, the creation of which was provided for in S.R. 386, as respondents, but, because the Committee had not been formed in the Senate at the time of the petition's filing, and, thus, no members had been formally appointed, the petition referred to those Senators as John Does.

did not empower the General Assembly to impeach local elected officials such as the DA, and, relatedly, the power of removal of locally elected officials in the City of Philadelphia was delegated to its government under its Home Rule Charter, *id.* at ¶¶ 51-61; and (3) the Articles did not assert viable claims that the DA engaged in "misbehavior in office" as that term is used in Article VI, Section 6, of the Pennsylvania Constitution *id.* at ¶¶ 62-79.

As specific relief, the DA requested that the Commonwealth Court make the following declarations:

- o [T]he Amended Articles and related legislative business, including Senate Resolutions 386, 387, and 388, became null and void on November 30, 2022, upon the adjournment *sine die* of the 206th General Assembly legislative session.

- o Article VI, Section 6 of the Pennsylvania Constitution does not authorize impeachment of [the DA] by the General Assembly.

- o [T]he Amended Articles against [the DA] do not allege conduct that constitutes "any misbehavior in office" within the meaning of Article VI, Section 6 of the Pennsylvania Constitution.

- o [T]he Respondents have no authority to take up the Amended Articles and any such efforts would be unlawful.

- o [T]hat any effort by the Respondents, House of Representatives or Senate to take up the Amended Articles or related legislation, including Senate Resolutions 386, 387, or 388, is unlawful.

*Id.*, Prayer for Relief, ¶¶ (A)-(E). The DA also filed an accompanying application for summary relief on these claims.

Impeachment Managers responded by filing preliminary objections seeking dismissal of the petition, asserting: (1) the questions of whether impeachment proceedings can continue into a new session of the General Assembly, as well as whether the DA's alleged conduct constitutes "any misbehavior in office," were non-justiciable

political questions; and (2) the questions of whether an elected district attorney is subject to impeachment and removal by the General Assembly, and whether the impeachment charges against the DA allege conduct sufficient to warrant his removal from office, were not ripe for judicial review.

Senate President filed an answer to the DA's motion for summary relief, and a cross application for summary relief in which she asserted that the Senate, as a whole, was an indispensable party to this action, and that the DA's failure to join the Senate deprived the Commonwealth Court of subject matter jurisdiction. Senate President also joined Impeachment Managers' argument that the DA's claims were neither justiciable nor ripe for review, and, in any event, were legally insufficient to justify a grant of declaratory relief.

The Commonwealth Court undertook adjudication of this matter on an expedited basis. The Minority Leader of the Pennsylvania Senate, Senator Jay Costa, ("Senate Minority Leader"), filed a petition to intervene, which the court granted.

After receiving expedited briefing from the parties, the Court issued an order on December 30, 2022, disposing of the Petition for Review. *Krasner v. Ward*, 563 MD 2022 (Pa. Cmwlth. filed Dec. 30, 2022) (order).[15] Regarding the jurisdictional question, the court ruled against Senate President's claim that the Pennsylvania Senate and the Senate Impeachment Committee were indispensable parties, on the basis that the Senate President was named as a party and her interest was "indistinguishable from that of the Senate as a whole, and of the [Impeachment Committee], and her involvement here has

---

[15] Comprising the Commonwealth Court panel were Judges Renee Cohn-Jubelirer, Patricia McCullough, Michael Wojcik, and Ellen Ceisler. The order was signed by Judge Ceisler. No judge on the panel noted any dissent to the order.

positioned her to adequately defend and protect those parties' interests." *Id.* at 2.[16]
Relevant to the issues presented in the present appeal, the court overruled Impeachment Managers' preliminary objection based on justiciability, and denied Impeachment Managers' preliminary objection and Senate President's request for summary relief based on the ripeness of the DA's claims. *Id.* at 2-3.

On the merits of the DA's issues, the order denied the DA relief on his claim that the Articles terminated upon adjournment of the General Assembly and also denied the DA relief on his claim that Article VI, Section 6, applied only to statewide officeholders. *Id.* at 3. The court, however, agreed with the DA that Article VI, Section 6, allows impeachment of a public official only for conduct which amounts to the common law crime of "'misbehavior in office,' *i.e.*, failure to perform a positive ministerial duty or performance of a discretionary duty with an improper or corrupt motive." *Id.* at 4 (quoting, *inter alia*, *In re Braig*, 590 A.2d 284, 286-88 (Pa. 1991)). The order also found Articles of Impeachment I and VI improperly challenged the DA's discretionary authority, and Articles III, IV and V unconstitutionally intruded upon this Court's exclusive authority to govern the conduct of attorneys in the Commonwealth — including district attorneys. *Id.* at 4. The order indicated that an opinion would follow.[17]

---

[16] Senate President does not renew this claim before us.

[17] Subsequently, on January 5, 2023, the court dismissed a *pro se* petition to intervene *nunc pro tunc* filed on January 3, 2023 by Vamsidhar Vurimindi. The court ruled that this petition was untimely, as it was filed "well beyond" the time allowed by the court's December 6, 2022 case management order. *Krasner v. Ward*, 563 MD 2022 (Pa. Cmwlth. filed Jan. 5, 2023) (order). The court also ruled that Vurimindi failed to meet any of the grounds for intervention. Vurimindi appealed this dismissal at 5 EAP 2023, which we address separately.

On January 11, 2023, the Senate of the 207th Session of the General Assembly met and administered an oath to its members for the purpose of sitting as jurors in an impeachment trial of the DA; however, the Senate then immediately voted to postpone the trial indefinitely. Senate Journal, 1/11/23, at 69-70.

On January 12, 2023, the Commonwealth Court issued an opinion in support of its order. *Krasner v. Ward*, 563 MD 2022 (Pa. Cmwlth. filed Jan. 12, 2023) (unpublished memorandum) ("*Krasner*"). The opinion was authored by Judge Ceisler and joined in full by Judge Cohn-Jubelirer. Judge Wojcik joined the majority opinion on all issues except the justiciability question, from which he dissented, despite his original vote to join the court's order in full. Judge McCullough filed a separate dissenting opinion.

Pertinent to the issues raised in the present appeals, the Commonwealth Court first considered Impeachment Managers' claim that the DA's challenges were non-justiciable. The court recognized that there is a limited category of legal issues which are political questions and not subject to judicial review: they involve the Legislature's exercise of a power which the Constitution "entrust[s] exclusively and finally to the political branches of government for 'self-monitoring.'" *Krasner*, slip op. at 11 (quoting *Sweeney v. Tucker*, 375 A.2d 698, 705-706 (Pa. 1977)). The court noted that "courts have no jurisdiction in impeachment proceedings, and no control over their conduct, *so long as actions taken are within constitutional lines*." *Id.* at 12 (quoting *In re Dauphin County Grand Jury, Sept. 1938*, 2 A.2d 802, 803 (Pa. 1938) (emphasis original)). The court interpreted this pronouncement as establishing that "determining the *constitutionality* of an impeachment proceeding is something that falls squarely within the scope of judicial

authority, but anything beyond that rests within the sole purview of the General Assembly." *Id.* (emphasis original).

The court found that, because the DA's claims that the impeachment proceedings violated provisions of the Pennsylvania Constitution governing which officeholders can be impeached and removed, the permissible reasons for impeachment and removal, and when such impeachment and removal proceedings can take place, they presented non-political questions which are justiciable by a court of the Commonwealth.

The court also noted that the specific remedy which the DA sought – declaratory relief under Section 7541(a) of the Declaratory Judgments Act – was compatible with its prior holding in *Larsen v. Senate of Pennsylvania*, 646 A.2d 694 (Pa. Cmwlth. 1994) (holding that courts could not halt an impeachment proceeding through the issuance of an injunction), as the DA did not seek to bar the Senate from conducting an impeachment hearing, but, instead, trusted that, if a declaratory judgment was entered indicating that the impeachment was unconstitutional, the Senate would refrain from carrying out the hearing. *Krasner*, slip op. at 12 n.7. The court found this to be consistent with the remedial purpose of the Declaratory Judgments Act: that it is to be liberally construed to effectuate its ultimate goal of providing "relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Id.* at 12 (quoting 42 Pa.C.S. § 7541(a)). Therefore, the court refused to accede to Impeachment Managers' argument that the questions raised in the DA's petition were non-justiciable.

Regarding the question of whether the DA's specific claims were ripe for review, the court found that they were. Even though the Articles of Impeachment set forth procedures allowing the DA to raise objections to evidence and make motions during the

impeachment trial, the court found that "each of District Attorney's claims presents threshold questions of law and constitutional interpretation that require no additional factual development." *Id.* at 16-17.

Turning to the substantive constitutional issues before us, the court first considered the DA's claim that the adjournment *sine die* of the 206th General Assembly also terminated the impeachment proceedings against him. The court acknowledged prior decisions from our Court, such as *Brown v. Brancato*, 184 A. 89 (Pa. 1936) (holding that the powers of an investigative committee created by the House expired upon the General Assembly's adjournment *sine die*), and *Frame v. Sutherland*, 327 A.2d 623 (Pa. 1974) (plurality) (interpreting our Constitution to require the mutual consent of both the House and Senate to adjourn *sine die*, given that allowing unilateral adjournment by the House or the Senate would render the other body powerless to have its bills enacted into law), but interpreted them as standing for the limited proposition that only *legislative* actions are terminated upon the adjournment of the General Assembly *sine die*. Consequently, it deemed those decisions not to control the outcome of this case, based on its conclusion that impeachment proceedings are not of the same nature as legislative proceedings. *Krasner*, slip op. at 21.

The court instead relied on our decision in *Commonwealth v. Griest*, 46 A. 505 (Pa. 1900) (holding that a proposed constitutional amendment did not have to be presented to the Governor for his approval or disapproval, given that the approval process for an amendment was in a separate article of the Constitution and established an entirely distinct process than that for enacting legislation), which it interpreted to mean that, whenever one Article of the Constitution provides for a specific procedure, that Article

governs over the Article setting out the General Assembly's general legislative powers – *i.e.*, Article III. The court noted that the legislature's impeachment power and procedures are delineated in Article VI, Sections 4 and 5, of our Constitution,[18] and so it reasoned that these powers and procedures are distinct from the General Assembly's power and procedures to promulgate laws set forth in Article III.

Although citing no authority from Pennsylvania courts characterizing the General Assembly's power of impeachment as a judicial power, the court nevertheless concluded that it was, based upon a 1913 decision of a New York trial court and a 1924 decision of the Texas Supreme Court. *Krasner*, slip op. at 22 (citing *People ex rel. Robin v. Hayes*, 143 N.Y.S. 325, 327 (Ny. Sup. 1913); *Ferguson v. Maddox*, 263 S.W. 888 (Tex. 1924) (holding that the power conferred by the Texas Constitution on its house of representatives to bring charges and its senate to try those charges are, at their core, judicial in nature and do not involve legislative functions)).

---

[18] These sections of our Constitution provide:

> **§ 4. Power of impeachment**
> The House of Representatives shall have the sole power of impeachment.

Pa. Const. art. VI, § 4.

> **§ 5. Trial of impeachments**
> All impeachments shall be tried by the Senate. When sitting for that purpose the Senators shall be upon oath or affirmation. No person shall be convicted without the concurrence of two-thirds of the members present.

Pa. Const. art. VI, § 5.

The court conceded that the Pennsylvania Constitution does not explicitly address the duration of what it perceived to be this judicial power, or what effect the termination of one session of the General Assembly and the beginning of a new session had on its ability to exercise that power. Even so, it concluded, based on its review of the general historical authority governing British parliamentary proceedings, as well as prior impeachment proceedings in Pennsylvania, other states, and at the federal level, that our Constitution does not require the impeachment and trial of a public official to be completed within the same session of the General Assembly.

In this regard, the court found persuasive the reasoning of an 1872 decision from the Florida Supreme Court which analogized the position of state senators sitting as judges in an impeachment proceeding to that of judges presiding over an ordinary trial, and that the Florida Senate, when acting in the role of a judicial tribunal, did not die or cease to exist with the adjournment of the session; rather, its business "remain[s] upon its calendar or docket *until the Senate sitting as a court* enters an order finally disposing of each case." *Id.* at 23 (quoting *In re Opinion of Justices*, 14 Fla. 289, 297-98 (Fla. 1872) (emphasis original)). Consequently, the court concluded that the Senate's adjournment after receiving the Articles of Impeachment did not affect its power to conduct a trial on those articles.

With respect to the DA's second issue raised before our Court — whether the DA is a "civil officer" within the scope of the impeachment power of the legislature delineated in Article VI, Section 6, of our Constitution — the court concluded that he was. In reaching this conclusion, the court relied on prior caselaw from our Court in which we suggested that Article VI, as a whole, extends not only to elected state officeholders, but also to local

officeholders.  The court noted that, in prior cases involving Article VI, Section 7[19] – which governs the removal of civil officers – our Court has extended the scope of its application to county and local officials on the basis that "civil officers," as referred to therein, may be state, county, or municipal.  *Krasner*, slip op. at 27-28 (citing, *e.g.*, *Burger v. McGuffey School District*, 923 A.2d 1155 (Pa. 2007) (school superintendent appointed by school board was within the category of "civil officers" referred to in Article VI, Section 7)).

The court also highlighted that, in *Commonwealth ex rel. Specter v. Martin*, 232 A.2d 729 (Pa. 1967), a fractured plurality of our Court agreed that then-District Attorney Arlen Specter was subject to identical removal provisions in a prior version of Article VI, Section 7, as he was within the category of "all civil officers" referred to by that Article. The Commonwealth Court reasoned that there was no basis to treat the identical language in Article VI, Section 6, governing civil officers differently, and, hence, the court ruled that it applied to the DA as a county official.[20]

---

[19]  This constitutional provision states:

> All civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime.  Appointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed.  All civil officers elected by the people, except the Governor, the Lieutenant Governor, members of the General Assembly and judges of the courts of record, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate.

Pa. Const. art. VI, § 7.

[20] The court also acknowledged that procedures exist under the First Class Cities Government law, 53 P.S. §§ 12199-12205, which allow for the removal of municipal officers like the district attorney, but it viewed these procedures as merely complementary to the impeachment procedure of Article VI, Section 6.

The court next addressed the DA's claim that the Articles of Impeachment failed to allege that he engaged in "any misbehavior in office," as required for impeachment under Article VI, Section 6. The court noted that, while our Court has never construed the meaning of the term "any misbehavior in office" within the context of this provision, in *In re Braig*, 590 A.2d 284 (Pa. 1991), we interpreted this term as used in a now-repealed section of the Pennsylvania Constitution — former Article V, Section 18(l), governing removal of jurists who were convicted in a court of law "of misbehavior in office" — as well as its present use in Article VI, Section 7, and held that "misbehavior in office" referred to "a common law crime consisting of the failure to perform a positive ministerial duty of the office or the performance of a discretionary duty with an improper or corrupt motive." *Krasner*, slip op. at 32 (quoting *Braig*, 590 A.2d at 362).

The court below noted that Article VI, Section 6, was amended to its present form in 1966, having previously applied only to "any misdemeanor in office," and, based on its examination of the historical context of the substitution of "misbehavior in office" for the prior terminology, the court concluded that the 1966 amendments were intended to align the provision with other provisions of the Constitution, such as Article VI, Section 7. Thus, the Court determined that this language, as employed in Article VI, Section 6, means, as it does in those other provisions, "the failure to perform a positive ministerial duty or the performance of a discretionary duty with an improper or corrupt motive." *Id.* at 37. Accordingly, the court ruled that "each of the [Articles of Impeachment] meets constitutional muster only if the assertions made therein would support a conclusion that [the DA] failed to perform a positive ministerial duty or performed a discretionary duty with an improper or corrupt motive." *Id.* at 38.

Applying this standard to the allegations against the DA in Articles of Impeachment I and VII, the court concluded the allegations therein did not facially constitute "misbehavior in office" and so they did not support his impeachment under Article VI, Section 6 of the Constitution.

Specifically, Article I alleged that the District Attorney was derelict in his official duties by, *inter alia*, firing experienced line prosecutors and hiring ones without the necessary level of expertise; withdrawing his office from the Pennsylvania District Attorneys Association due to policy disagreements; reorienting office charging and plea bargaining policies regarding certain prostitution, drug possession, and other low-level crimes to focus on limiting pre-trial detainment; and increasing the use of alternative sentencing practices instead of post-conviction incarceration, which the Article asserted led to decreased prosecution of crimes and guilty verdicts, as well as a sharp increase in the crime rate in Philadelphia. Impeachment Resolution at 26-29.

The Commonwealth Court found that:

> Each of the House's concerns in Article I pertains to discretionary determinations made by [the DA] in his role as Philadelphia's district attorney, but are not supported by allegations that those determinations were the product of an improper or corrupt motive. Instead, the House simply appears not to approve of the way [the DA] has chosen to run his office. Regardless of whether any of the House's concerns have substantive merit, it remains that such disagreements, standing alone, are not enough to create a constitutionally sound basis for impeaching and removing [the DA].

*Krasner*, slip op. at 39. The court observed that the DA's elected position gives him wide latitude to implement the policies he deems best; however, critically from the court's perspective, there were no assertions made that the DA's policy decisions were the

product of any misbehavior in office – *i.e.*, that they were the product of an improper or corrupt motive on his part.

Similarly, the court concluded that the DA's decision to deprioritize the prosecution of certain types of crime, including "prostitution, theft and drug-related offenses, among others," which formed the factual basis of Article of Impeachment VII, *see* Impeachment Resolution at 49, was also within the broad discretion conferred on him by virtue of his office to make policy decisions and prosecution choices. The court found that these allegations, in and of themselves, did not establish that he exercised this discretion with an improper or corrupt motive; hence, the court ruled they were also insufficient as a matter of law to serve as a basis for impeachment under Article VI, Section 6.

Finally, the court considered the DA's claim that the allegations of his violations of the Code of Judicial Conduct and the Code of Professional Responsibility contained in Articles of Impeachment III, IV, and V were beyond the purview of the General Assembly to adjudicate because the jurisdiction to adjudicate such claims is exclusively vested with our Court. The court agreed with the DA's argument, noting that, under the provisions of 16 P.S. § 1401(o),[21] a district attorney is subject to the Rules of Professional Conduct and

---

[21] This statute provides:

> (o) A district attorney shall be subject to the Rules of Professional Conduct and the canons of ethics as applied to judges in the courts of common pleas of this Commonwealth insofar as such canons apply to salaries, full-time duties and conflicts of interest. Any complaint by a citizen of the county that a full-time district attorney may be in violation of this section shall be made to the Disciplinary Board of the Supreme Court of Pennsylvania. If any substantive basis is found, the board shall proceed forthwith in the manner prescribed by the rules of the Supreme Court and make such recommendation for disciplinary action as it deems advisable,

(continued…)

the Code of Judicial Conduct. The court found that, under this statutory provision, in order for an alleged violation of these provisions to be adjudicated, a complaint must be filed with the Disciplinary Board of our Court, and the complaint will then proceed in accordance with the rules and procedures our Court has established for that process. This, the court determined, was consistent with Article V, Section 10(c),[22] of the

---

provided, however, that if the Supreme Court deems the violation so grave as to warrant removal from office, the prothonotary of the Supreme Court shall transmit its findings to the Speaker of the House of Representatives for such action as the House of Representatives deems appropriate under Article VI of the Constitution of Pennsylvania.

16 P.S. § 1401(o).

[22] This Article of the Pennsylvania Constitution provides:

(c) The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the Judicial Branch, if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose. All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions. Notwithstanding the provisions of this section, the General Assembly may by statute provide for the manner of testimony of child victims or child material witnesses in criminal proceedings, including the use of videotaped depositions or testimony by closed-circuit television.

Pa. Const. art. V, § 10.

Pennsylvania Constitution, which vests the exclusive power to govern the conduct of attorneys to our Court.

The court noted that Section 1401(o) would also allow our Court, upon a finding that the DA's violation was so grave as to warrant removal from office, to refer the matter to the "Speaker of the House . . . for such action as the House . . . deems appropriate under Article VI." *Krasner*, slip op. at 42 (quoting Section 1401(o)). The court reasoned that, based on this statutory language and the allocation of constitutional responsibility for attorney discipline, our Court was the proper forum for review of these claims in the first instance, not the General Assembly, which can only commence a removal process for grave violations after our Court makes the necessary finding and referral.

In his concurring opinion, Judge Wojcik candidly admitted to joining the court's *per curiam* order in full, but he indicated that, after further reflection, he had concluded that the questions regarding the constitutionality and legality of Articles of Impeachment I, II, VI, and VII were non-justiciable, as, in his view, the power to issue those Articles, and to try them, was vested by the Constitution solely in the House and Senate, respectively. He joined the majority opinion in all other respects.

In her dissenting opinion, Judge McCullough opined that the Commonwealth Court did not have jurisdiction over this matter because the Senate Impeachment Committee, which at the time of the litigation had not yet been formed, was not joined as an indispensable party. Judge McCullough further asserted that, assuming *arguendo* that the Commonwealth Court had jurisdiction to consider the appeal, she would join the court's rejection of the DA's first and second claims regarding whether his impeachment survived *sine die* adjournment and whether he was a civil officer subject to impeachment.

However, she indicated she would find that the DA's claims that the Articles of Impeachment failed to state sufficient legal grounds for his removal were non-justiciable, as, in her view, he is challenging conduct — his conviction and removal — which has not yet occurred.

Impeachment Managers appealed from the Commonwealth Court's order, and the Senate President and the DA cross-appealed. Our Court consolidated these appeals for disposition, and we have designated the DA as the Appellant herein.

## II. Issues

In his appeal, the DA presents the following two issues for our Court's consideration, which we have rephrased for clarity:

  a. Whether the Articles of Impeachment passed by the 206th General Assembly carry over into the 207th legislative assembly, after the 206th General Assembly adjourned *sine die*?

  b. Whether the DA, who is a locally elected official, is an "other civil officer" subject to impeachment under Article VI, Section 6, of the Constitution?

DA's Brief at 8.

In their cross-appeal, Impeachment Managers raise the following issues, which we have reordered for purposes of our discussion and have rephrased for clarity:

  a. Whether the Commonwealth Court erred in concluding that the DA's challenges to his impeachment proceedings were justiciable?

  b. Whether the Commonwealth Court erred in concluding that the issues presented by the DA's challenges to his impeachment proceedings were ripe for review?

  c. Whether the DA is a civil officer subject to impeachment under Article VI, Section 6, of the Constitution?

d. Whether the Commonwealth Court erred in concluding that the conduct alleged in the Articles of Impeachment did not constitute "misbehavior in office" in accordance with the meaning of that term as it is used in Article VI, Section 6, of the Constitution?

e. Whether Articles of Impeachment III, IV, and V, which were based on the DA's alleged violation of the Rules of Professional Conduct and the Code of Judicial Conduct, intruded on this Court's exclusive authority under the Pennsylvania Constitution to govern the conduct of attorneys in our Commonwealth?

f. Whether the Commonwealth Court erred in concluding that the DA's conduct alleged in Articles of Impeachment I and VII did not furnish a basis for impeachment, as it involved the exercise of his discretionary authority?

Impeachment Managers' Brief at 6-8.

### III. Analysis

We turn now to the substantive issues raised by the parties to this appeal and cross-appeal. For reasons we explain at greater length herein, we find the DA's first claim – that the Commonwealth Court erred in concluding that the Articles of Impeachment did not expire upon the *sine die* adjournment of the 206th Session of the General Assembly – to be dispositive of this appeal; thus, we confine our analysis to this issue.

However, before we consider the substantive merits of this issue, we must address the initial contention of Impeachment Managers that this issue is a non-justiciable political question.[23]

### A. Justiciability

#### 1. Arguments

---

[23] Senate President does not join in this argument in her brief. Further, Impeachment Managers raise no argument regarding the ripeness of this issue for review.

Impeachment Managers aver that, as our Court has recognized, the question of justiciability is a threshold one which must be resolved before a court addresses the merits of a case. Impeachment Managers' Brief at 24 (quoting *Robinson Township v. Commonwealth*, 83 A.3d 901, 917 (Pa. 2013)). Impeachment Managers note that, in *Robinson Township*, our Court set forth a "well settled" standard for a court to determine whether a claim is non-justiciable and will, as a result, refrain from taking action on it. Under this standard, courts will refrain from resolving a dispute and reviewing the actions of another branch only "'where the determination whether the action taken is within the power granted by the Constitution has been entrusted exclusively and finally to the political branches of government for self-monitoring'." *Id.* at 25 (quoting *Robinson Township*, 83 A.3d at 928).

Impeachment Managers argue that Article VI of the Pennsylvania Constitution "confers impeachment matters exclusively to the General Assembly," given that Article VI, Section 4, grants the House "*the sole power of impeachment*," and Section 5 of that same Article specifies that "*all impeachments shall be* tried by the Senate." *Id.* at 26-27 (emphasis original). Impeachment Managers buttress their textual commitment claim by highlighting that Article II, Section 11, of the Constitution also gives the House and the Senate the "power to determine the rules of its proceedings." *Id.* at 27 (quoting Pa. Const. art. II, § 11). Impeachment Managers reason that these provisions, read *in toto*, give the House and Senate the right to make rules prescribing how impeachment proceedings will be carried out. Therefore, they view the question of whether an impeachment proceeding can carry over from one term of the General Assembly to another to fall within this

rulemaking power as merely "a basic housekeeping matter for the General Assembly." *Id.* at 28.

Impeachment Managers additionally aver that our Court recognized the principle that courts have no role to play in the impeachment process in *In re Dauphin County Grand Jury,* 2 A.2d 802, 803 (Pa. 1938), wherein we stated that "*the courts have no jurisdiction in impeachment proceedings, and no control over their conduct.*" Impeachment Managers' Brief at 28 (emphasis original). Impeachment Managers also argue that *Nixon v. United States*, 506 U.S. 224 (1993) (examining the history of the federal Constitutional Convention to conclude that the Framers intended no role for the judiciary in the impeachment process), supports this proposition, albeit in the context of impeachment proceedings under the federal Constitution. Impeachment Managers likewise contend that the Commonwealth Court adhered to this principle in *In re Larsen*, 646 A.2d 694 (Pa. Cmwlth. 1994), when it held that the impeachment procedures adopted by the Senate in that case were not subject to judicial review. Thus, Impeachment Managers contend that the Commonwealth Court should not have addressed the question of the effect of *sine die* adjournment on the Articles of Impeachment.

In reply, the DA emphasizes that our Constitution "does not clearly and unambiguously entrust to the General Assembly the 'sole prerogative' to determine whether articles of impeachment survive the adjournment *sine die* of the General Assembly." DA's Reply Brief at 10. Further, the DA highlights that our Court has previously and explicitly recognized that we have "the power to make sure that the General Assembly is exercising its impeachment powers within the limits of the Constitution[.]" *Id.* at 10 (quoting *In re Dauphin County Grand Jury,* 2 A.2d at 803 ("[T]he

courts have no jurisdiction in impeachment proceedings, and no control over their conduct, *so long as actions taken are within constitutional lines*." (emphasis original))).

The DA stresses that Impeachment Managers have identified no clause of the Constitution which provides that the House has the "sole prerogative" to determine whether articles of impeachment survive the *sine die* adjournment of the General Assembly. *Id.* at 11. The DA agrees that Articles VI, Sections 4 and 5, of the Constitution do empower the General Assembly to take certain actions with respect to the impeachment process; however, the DA disputes that these sections also give the General Assembly the exclusive responsibility to *interpret* its own powers with respect thereto, as the text of those sections does not confer such a power.

Relatedly, the DA underscores that Article II, Section 4, "does not expressly commit to the General Assembly the power to review its compliance with this provision or exempt issues relating to *sine die* adjournment (including impeachment) from judicial review." *Id.* at 14. Indeed, the DA points out that our Court has already reviewed and adjudicated what effect *sine die* adjournment had on actions of the General Assembly in *Frame* and *Brown*, *supra*, and he asserts these decisions demonstrate there is no impediment to our Court's consideration of the application of Article II, Section 4, to the resolution of this matter.

Senate Minority Leader's brief aligns with the DA's arguments on this issue, but additionally notes that he regards our Court's exercise of its authority under the Pennsylvania Constitution to resolve constitutional questions as "no slight to its coequal branches, but, rather, [it] reflects a commitment to the rule of law and our fundamental legal principles even when they may lead to unpopular, but constitutionally required

results, that all three branches should share." Senate Minority Leader's Reply Brief at 5 n.2.

## 2. Discussion

Resolving controversies involving whether a particular action of the General Assembly has transgressed the limitations on its power to act set by our Commonwealth's Constitution is one of this Court's most fundamental responsibilities under that charter. Our exercise of that responsibility through the process of judicial review — to "say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803) — is integral in ensuring that our Commonwealth's democratic form of government functions as it was designed and intended by its architects. As we have emphasized in this regard:

> The cornerstone of our republican democracy is the principle of government divided into three separate, co-equal branches that both empower and constrain one another. Judicial review stands as a bulwark against unconstitutional or otherwise illegal actions by the two political branches. . . . The foundation for the rule of law as we have come to know it is the axiom that, when disagreements arise, the Court has the final word regarding the Constitution's meaning.

*William Penn School District v. Pennsylvania Department of Education*, 170 A.3d 414, 435-36 (Pa. 2017) (citation and internal quotation omitted).

Thus, "[o]rdinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers, and abstention under the political-question doctrine is implicated in limited settings." *Robinson Township*, 83 A.3d at 927-28 (citations and internal quotation marks omitted). However, there are certain legislative powers which our Constitution confers on the legislative branch of our tripartite system of governance that are not subject to judicial review. Indeed, "[a] challenge to the Legislature's exercise of a power which the

Constitution commits exclusively to the Legislature presents a nonjusticiable 'political question.'" *Sweeney*, 375 A.2d at 705. The meaning and scope of the political question doctrine under the United States Constitution and its application by federal courts since its articulation in the seminal United States Supreme Court decision of *Baker v. Carr*, 369 U.S. 186 (1962) has been, and continues to be, the subject of intense scholarly debate. *Sweeney*, 375 A.2d at 705; *see also* Curtis Bradley & Eric A Posner, *The Real Political Question Doctrine*, 75 Stan. L. Rev. 1031 (2023).

Nevertheless, whatever may be the current contours of this doctrine utilized by federal courts, it is well-established in our jurisprudence that "notions of case or controversy and justiciability in Pennsylvania have no constitutional predicate, do not involve a court's jurisdiction, and are regarded instead as prudential concerns implicating courts' self-imposed limitations." *Robinson Township*, 83 A.3d at 917. In matters involving our Constitution, "we will abstain from reviewing cases only where the determination whether the action taken is within the power granted by the Constitution *has been entrusted exclusively and finally to the political branches of government for 'self-monitoring'*." *William Penn School District*, 170 A.3d at 439 (emphasis original). Thus, when considering whether to refrain from adjudicating a challenge involving the interpretation of particular constitutional provisions under this doctrine we must assess "whether our Constitution, explicitly or impliedly, can be read as reflecting the clear intent to entrust the legislature with the sole prerogative to assess the adequacy of its own effort to satisfy that constitutional mandate." *Id.*

Our Court has enumerated a panoply of potentially relevant factors in making this assessment, such as whether:

there is a textually demonstrable constitutional commitment of the disputed issue to a coordinate political department; there is a lack of judicially discoverable and manageable standards for resolving the disputed issue; the issue cannot be decided without an initial policy determination of a kind clearly for non judicial discretion; a court cannot undertake independent resolution without expressing lack of the respect due coordinate branches of government; there is an unusual need for unquestioning adherence to a political decision already made; and there is potential for embarrassment from multifarious pronouncements by various departments on one question.

*Robinson Township*, 83 A.3d at 928. The justiciability arguments Impeachment Managers present to our Court, which are textual in nature, focus only on the first of these factors.

As indicated above, Impeachment Managers contend that because Article II, Sections 2, 4 and 11, and Article VI, Sections 4 and 5, read collectively, establish that the General Assembly has been given the right to prescribe the manner in which impeachment proceedings will be carried out – *i.e.,* to establish procedures for conducting an impeachment – this also grants it the exclusive right to decide the separate substantive question of whether it had the constitutional authority to act on the Articles of Impeachment after *sine die* adjournment. Respectfully, we reject that conclusion.

The text of Article II, Sections 2 and 4, is utterly devoid of any language which would confer an exclusive right on the General Assembly to determine its own compliance with these provisions. Impeachment Managers are correct that Article II, Section 11, which grants each House of the General Assembly the right "to determine the rules of its proceedings," Pa. Const. art. II, § 11, textually empowers both the House and Senate to promulgate procedural rules for impeachment proceedings transpiring in either body; however, this exclusive power is properly implicated only when those impeachment

proceedings are authorized by the Constitution. Section 11 does not, however, textually confer on the House or the Senate the exclusive power to finally determine whether the *act* of conducting the impeachment proceeding itself is permitted by the Constitution, which is the issue in this case. *See Brown v. Brancato*, 184 A. 89, 93 n.6 (Pa. 1936) (observing that Article II, Section 11, had no application in our Court's interpretation of Article II, Section 4, to determine whether the investigative and subpoena powers held by a House impeachment committee continued after *sine die* adjournment of the General Assembly); *Zemprelli v. Daniels*, 436 A.2d 1165, 1170 (Pa. 1981) (holding that a determination of whether a gubernatorial appointment to the State Tax Equalization Board was approved by "a majority of the members elected to the Senate," as required by Article IV, Section 8(a), was a question involving the meaning of our Constitution, which is "within the province of the courts to interpret"; hence, Article II, Section 11, did not foreclose our Court from adjudicating that issue as a political question).

Likewise, there is nothing in the text of Article VI, Sections 4 or 5, which grants the House or Senate the exclusive authority to decide this issue. The fact that Article VI, Section 4, grants to the House the "sole power of impeachment," and Section 5 reserves to the Senate the power to try all cases of impeachment, does not compel a different conclusion. As we explained in *William Penn, supra*, "whether the constitutional text commits exclusive responsibility for a particular governmental function to one of the political branches" is not the dispositive consideration. 170 A.3d at 439 (citation omitted). Instead, "the issue is whether the Constitution has given one of the political branches final responsibility for interpreting *the scope and nature of such a power*." *Id.* (emphasis added). There is simply nothing in the text of Sections 4 or 5 which confers on either the

House or Senate the final responsibility to determine the question of the duration of the powers granted to those bodies by these provisions. Rather, as resolution of this question involves interpretation of the functional interrelationship of those constitutional provisions with Article II, Sections 2 and 4, this is a responsibility the Constitution expressly confers on our Court. *See id.* at 437 ("It is the province of the Judiciary to determine whether the Constitution or laws of the Commonwealth require or prohibit the performance of certain acts."). Indeed, as noted above, our Court has previously exercised our constitutional power of judicial review to determine the very type of issue presented by this case: whether one chamber of the General Assembly remained empowered to undertake official actions after it had adjourned *sine die*. *See Brown supra*. Consequently, our Court's performance of this task in this instance does not infringe on the powers conferred on the General Assembly under Article VI, Sections 4 and 5, to conduct impeachment proceedings.

Moreover, *In re Dauphin County Grand Jury*, *supra,* does not compel a contrary result, as Impeachment Managers have argued. In that case, we considered the question of whether a trial court had jurisdiction to enter an order barring the testimony of two witnesses before a committee of the House which was investigating whether sufficient evidence existed to prove that certain civil officers committed criminal acts that constituted misdemeanors in office, which was at that time the requirement under Article VI, Section 3, for impeachment of such officials.

Our Court concluded that our Constitution did not confer on the trial court the power to enjoin the committee from calling the witnesses to testify. We observed that Article VI, Section 1, granted to the House the "sole power of impeachment," which we characterized

as "plenary *within constitutional limits*." 2 A.2d at 803 (emphasis added). We explicitly recognized, however, that the substantive question of whether the conduct in question met the constitutional definition of a misdemeanor in office was not then before our Court; rather, the issue was purely jurisdictional in nature: whether the trial court had the authority to bar the committee from calling witnesses as part of its investigation. We concluded that the trial court could not, reasoning that "courts have no jurisdiction in impeachment proceedings, and *no control over their conduct, so long as actions taken are within constitutional lines*." *Id.* (emphasis added). Consequently, we held that "[t]he courts cannot stay the legislature and the witnesses named are subject to call by the legislative committee at any time." *Id.*

Our Court therefore recognized a clear distinction between the authority of courts to judicially manage the conduct of impeachment proceedings which the General Assembly has already commenced pursuant to the power conferred on it by the Constitution, and the authority of the courts to make the final determination as to whether the impeachment proceedings themselves meet the Constitution's fundamental requirements. Thus, although we found no such constitutional grant of authority to courts for the wielding of the former power, critically, we recognized that, by contrast, courts have the full and exclusive right under our Constitution to exercise the latter power.

For all of these reasons, we conclude the question of the effect of the adjournment *sine die* is justiciable, and so we may address it.

**B. The effect of adjournment *sine die* on the Articles of Impeachment**

*1. Arguments*

The DA's central contention is that all "pending business before the General Assembly's two legislative bodies — the House and the Senate — terminates upon the adjournment *sine die* of the General Assembly." DA's Brief at 22. The DA argues that the business which was pending before the 206th Senate at the time of its adjournment *sine die* on November 30, 2022 included the Articles of Impeachment themselves, and thus these articles, which were pending in the Senate, terminated as of that date.[24] The DA avers that, because the Articles became null and void at the end of the 206th Senate, the 207th Senate is constitutionally prohibited from taking further action on them. The DA avers that the text of our Constitution compels this conclusion.

Specifically, the DA maintains that Article II, Section 4, establishes that the General Assembly exists as a continuing body for only two years, which is the term of elected Representatives under Article II, Sections 2 and 3; hence, he contends the 206th General Assembly ended on November 30, 2022, when it adjourned *sine die*. In the DA's view, any business pending before that body upon adjournment also expired at that time and may not carry over to a new session of the General Assembly. The DA emphasizes in this regard that the text of our Constitution is plain in establishing that the General Assembly's power to act on unfinished matters terminates upon adjournment at the end of its session, and nowhere in the text of those provisions or anywhere else in the Constitution is there an exception to this rule for what the Commonwealth Court considered to be "judicial business." *Id.* at 25. The DA contends that this is consistent with our decisions in *Brown* and *Frame*, *supra*, which he argues stand for the broad

---

[24] The DA adopts our Court's prior definition of the term *sine die*, set forth in *Creamer*, *supra,* which is to adjourn without fixing a date to reassemble. *See supra* note 11.

proposition that *all* of the General Assembly activities terminate at the time its session ends.

The DA avers that the requirements in Article II, Section 4, must be read in conjunction with Article VI, which governs impeachments. The DA highlights that Article VI, Section 4, grants to "*[t]he House of Representatives*" the "sole power of Impeachment," and Article VI, Section 5, requires that "[a]ll impeachments shall be tried by *the Senate*." *Id.* at 26 (quoting Pa. Const. art. VI, §§ 4, 5) (emphasis original). The DA emphasizes that these bodies – the House and the Senate – are the same bodies referenced in Article II, Section 4; thus, the limitations in Article II, Section 4, must be considered to be limitations on the impeachment process. The DA reasons that such restrictions are no different from other constitutional restrictions on the House and Senate, such as its requirements as to age and other qualifications for service of the members who will be participating in the impeachment process.

The DA reminds that, whenever the Constitution sets forth exceptions to its general requirements or its grant of powers to the General Assembly, it does so explicitly, such as in Article III, which places restrictions on the legislature's ability to enact legislation, or Article XI, which mandates the process for amending the Constitution. The DA notes that there is nothing in the text of Article VI which suggests an exception to the *sine die* rule for impeachment proceedings. Indeed, the DA points out that Article VI is, as the Commonwealth Court acknowledged, silent on the question of the temporal limits of the General Assembly to exercise its powers thereunder.

Senate Minority leader has filed a brief wholly aligned with the DA's interpretation in this regard. Senate Minority Leader adds that the principle that an adjournment *sine*

*die* renders all pending business null and void has been acknowledged by the Senate itself with its adoption of Senate Rule 12(j), which provides:

> **(j) Consideration** - second regular session.-- All bills, joint resolutions, resolutions, concurrent resolutions, *or other matters* pending before the Senate upon the recess of a first regular session convening in an odd-numbered year shall maintain their status and be pending before a second regular session convening in an even-numbered year but not beyond adjournment *sine die* or November 30th of such year, whichever first occurs.

Pa. Senate Rule 12(j) (emphasis added).

Additionally, Senate Minority Leader highlights that the practical effect of the Commonwealth Court's decision – creating what is, in essence, a freestanding judicial power in the legislature with respect to impeachments that transcends expiration of a session of the General Assembly – means, as a practical matter, "the House of *any* General Assembly can impeach *any* public official and leave the proceedings open in perpetuity, and the Senate of *any* General Assembly can convict them," which would thereby indefinitely subject that public official to the omnipresent threat of removal. Senate Minority Leader's Brief at 21 (emphasis original). Senate Minority Leader asserts that such an interpretation "simply cannot be the law." *Id.*

In response, Senate President argues that the structure of the Constitution does not support the DA's suggested construction. Senate President notes that the General Assembly's legislative and impeachment functions are provided for in two different articles of the Constitution, Articles II and VI. She reasons that their arrangement in this fashion evidences an intent to make the process of impeachment a wholly separate and distinct process from the process of legislation and, thus, that the provisions of Article II governing legislation do not apply to the impeachment process.

In support of this suggested construction, Senate President highlights the fact that, when the text of Article II is considered, it applies, as its introductory clause specifies, only to "*legislative* power" and does not mention impeachment; similarly, she notes that Article III, which concerns legislation, does not refer to impeachment. Senate President's Brief at 22 (emphasis original). Instead, in her view, Article VI controls because it is the sole article of the Constitution addressing impeachment. She stresses that, unlike Article II, Article VI does not refer to the exercise of legislative power.

Senate President urges this Court to reject what she characterizes as the DA's "invitation to engraft Article II's limitations on legislative authority onto the impeachment provisions of Article VI." *Id.* at 24. She notes that lawmaking is, at its core, an exercise in rulemaking with broad application, whereas holding an impeachment trial is a duty imposed solely on the Senate, confined to an individual case; these are markedly different exercises of power, in her view, and the Constitution should not be construed to treat them as equivalent.

Senate President acknowledges that there is no Pennsylvania appellate decision addressing this specific constitutional question; however, she asserts that our decision in *Griest*, *supra*, supports her conclusion, which the Commonwealth Court recognized. She avers that, just as the constitutional amendment process provided for in Article XVIII of the 1874 Constitution at issue in *Griest* was independent of other constitutional provisions, such as Article III, and, thus, did not depend on any other provision of the Constitution in order for its provisions to be executed, she reasons that Article VI is likewise independent, and does not depend on any other provision, such as Article II, in order for it to be effective.

Senate President also recounts five impeachments spanning the period from 1793 to 1826 in which the House authorized articles of impeachment against judges and other public officials, but then adjourned *sine die*, and the Senate trial on the articles took place in the subsequent session of the General Assembly. Senate President's Brief at 12-17. Senate President suggests these past practices are entitled to recognition by our Court in deference to the General Assembly's own interpretation of the constitutional provisions governing its functions.

In their separate response, Impeachment Managers' arguments parallel those of Senate President.

### 2. Discussion

Our Court's resolution of this question is guided by well-established tenets of constitutional interpretation. Paramount among these is that the plain language of the text of the constitutional provision at issue is the polestar of our analysis. *In re Bruno*, 101 A.3d 635, 659 (Pa. 2014). Thus, "the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 802 (Pa. 2018). Consequently, we will not interpret the Constitution "in a technical or strained manner, but are to interpret its words in their 'popular, natural and ordinary meaning.'" *Scarnati*, 173 A.3d at 1118) (quoting *Commonwealth v. Harmon*, 366 A.2d 895, 897 (Pa. 1976)).

Of greatest significance in this process of Constitutional interpretation is the principle that we consider our Constitution to be "an integrated whole" and strive "to give concomitant effect to all constitutional provisions." *In re Bruno*, 101 A.3d at 660. This approach "reflects an understanding that our charter is a fundamental document, which,

in recognizing citizens' rights and establishing government, provides essential checks and balances whose complexity is to be neither undervalued nor disregarded." *Id.*

We begin by reiterating the relevant constitutional provisions which are the focus of the parties' arguments.[25]  Article II, entitled "The Legislature," contains four relevant provisions, Sections 1 through 4, which provide:

### § 1. Legislative power

The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.

### § 2. Election of members; vacancies

Members of the General Assembly shall be chosen at the general election every second year.  Their term of service shall begin on the first day of December next after their election.  Whenever a vacancy shall occur in either House, the presiding officer thereof shall issue a writ of election to fill such vacancy for the remainder of the term.

### § 3. Terms of members

Senators shall be elected for the term of four years and Representatives for the term of two years.

### § 4. Sessions

---

[25]  Because we are construing our Commonwealth's Constitution as *presently* written, we do not regard the five impeachments from 1793 to 1826 cited by the legislative parties – for which impeachment articles were passed by the House in one session of the General Assembly, but trial occurred in a subsequent session of the Senate – to be relevant guideposts for our analysis of this issue.  Those impeachments took place under earlier versions of our Constitution which, critically, did not contain the present language of Article II, Section 4, approved by the voters of our Commonwealth on May 16, 1967. While this history must be considered, given the fundamentally dissimilar nature of the present constitutional provisions to the ones at issue in those cases, we do not find the practice utilized in those cases to be dispositive herein.  Likewise, we do not find the interpretations of the United States Constitution by federal courts, historical British parliamentary practices, or cases from other jurisdictions construing their state's constitutions, *see* Senate President's Brief at 33-35, to be controlling of our interpretation of the current constitutional language.

The General Assembly shall be a continuing body during the term for which its Representatives are elected. It shall meet at 12 o'clock noon on the first Tuesday of January each year. Special sessions shall be called by the Governor on petition of a majority of the members elected to each House or may be called by the Governor whenever in his opinion the public interest requires.

Pa. Const. art. II, §§ 2-4.

Article VI, entitled "Public Officers," contains two relevant provisions, Sections 4 and 5, which provide:

**§ 4. Power of impeachment**

The House of Representatives shall have the sole power of impeachment.

**§ 5. Trial of impeachments**

All impeachments shall be tried by the Senate. When sitting for that purpose the Senators shall be upon oath or affirmation. No person shall be convicted without the concurrence of two-thirds of the members present.

Pa. Const. art. VI, §§ 4-5.

Under the organization of our Constitution, certain provisions of Article II, including those set forth above, serve to establish general and irreducible foundational requirements which must be met in order for the General Assembly to be empowered to perform any of its duties enumerated in the remainder of the Constitution. Article II, Section 1, establishes the structure of the General Assembly as consisting of two bodies, the House of Representatives and the Senate. Article II, Sections 2 and 3 establish the manner in which members of the House and the Senate are to be chosen — by election — and the duration of their terms of service — two years for members of the House and

four years for members of the Senate.[26] Once their members have been elected, Article II, Section 4, specifies how long the House of Representatives and the Senate may function, collectively, as the General Assembly. Article II, Section 4, designates this period of time as a "session," and mandates that it last only for the duration of the terms of the members of the House of Representatives selected in the preceding election — that is, two years.

Article II, Section 5 establishes additional qualifications which members of the House of Representatives and the Senate must meet in order to serve in those respective bodies during a session of the General Assembly. Members of the House must be at least 21 years of age, and members of the Senate must be at least 25 years of age. Pa. Const. art. II, § 5. Members of both the House and the Senate must be "citizens and inhabitants" of the Commonwealth for four years, inhabitants of their districts for one year prior to their election, and residents of their districts while serving their terms of office. *Id.*

Article II, Section 10, establishes the minimum number of members of the House of Representatives and the Senate who must be present in order for those bodies to be empowered to conduct their chosen business, *i.e.*, a quorum:[27] "A majority of each House shall constitute a quorum, but a smaller number may adjourn from day to day and compel the attendance of absent members." Pa. Const. art. II, § 10.

---

[26] One half of the Senate's 50 members are elected by the voters every two years. 101 Pa. Code § 7.2(1).

[27] A quorum is generally defined as the "minimum number of members . . . who must be present for a deliberative assembly to legally transact business." Black's Law Dictionary (11th ed. 2019).

To reiterate, it is axiomatic that the Constitution is to be read as an integrated whole, with "effect . . . given to all of its provisions whenever possible." *Jubelirer v. Rendell*, 953 A.2d 514, 528 (Pa. 2008) (quoting *Cavanaugh v. Davis*, 440 A.2d 1380, 1382 (Pa. 1982)); *In re Bruno, supra*. Thus, when the terms "House of Representatives" and "Senate" are used in other provisions of the Constitution which confer specific powers on those bodies to collectively take official action, those terms must be understood to have the same meanings ascribed to them by Article II, and, consequently, as a necessary condition precedent to the House of Representatives and Senate executing powers afforded by such provisions, each body must be duly constituted and authorized to act under Article II.

Under the aforementioned provisions of the Constitution which delineate the powers of the House and the Senate with respect to impeachment proceedings, Article VI, Section 4, confers on the "House of Representatives" the sole power of impeachment. This means that only the House of Representatives, acting as a collective body, may exercise this power. The collective body that constitutes the House of Representatives when utilizing this power is comprised of the 203 Representatives elected for a term of two years which begin on the first day of December following their election in the preceding November.[28] *See* Pa. Const. art. II, §§ 2, 3; Pa. Const. art. II, § 16 (dividing the Commonwealth into "203 representative districts"); *see also* 101 Pa. Code § 7.2. ("The General Assembly consists of a: . . . (2) House of Representatives, composed of 203

---

[28] Under the Pennsylvania Election Code, elections for Representative and Senator in the General Assembly are held "the Tuesday next following the first Monday of November in each even-numbered year." 25 P.S. § 2751.

Representatives elected for terms of two years beginning on the first day of December next after their election.").

Once the House of Representatives has exercised its power of impeachment, then, textually, this immediately triggers the requirement of Article VI, Section 5, that "the Senate," again acting collectively as a body, hold a trial on the articles of impeachment passed by the House. The collective body of the Senate when this duty arises is comprised of 50 Senators, half of whom will be those members elected for terms of four years which begin on the first day of December following their election in November of that year, and the other half will be those serving the remainder of their four-year terms which began two years earlier. *See* Pa. Const. art. II, §§ 2, 3; Pa. Const. art. II, § 16 (dividing the Commonwealth into "50 senatorial" districts); *see also* 101 Pa. Code § 7.2. ("The General Assembly consists of a: (1) Senate, composed of 50 Senators elected for terms of four years beginning on the first day of December next after their election. One-half of the Senators are elected every two years. . . .").

As set forth above, Article II, Section 4, entitled "Sessions," establishes that the General Assembly – which is further defined in Article II, Section 1, as consisting of the House of Representatives and the Senate – "shall be a continuing body during the term for which its Representatives are elected." Pa. Const. art. II, § 4. Under Article II, Section 2, the term of an elected Representative begins on December 1 and, under Section 3 it is two years in duration; thus, it ends two years later on November 30. Therefore, under Article II, Section 4, the General Assembly is a continuing body only for this two year session, and, upon the expiration of that session, it ceases to exist. Necessarily then, so do the House of Representatives and the Senate, which together comprise the General

Assembly, cease to exist as functioning bodies at that time as well. *See Stroup v. Kapleau*, 313 A.2d 237, 242 (Pa. 1973) (after final adjournment "the Senate was not physically nor . . . technically [i]n session").

Concomitantly, all powers granted by the Constitution to the House of Representatives and the Senate last *only* for the duration of the session of the General Assembly in which those bodies came into being under Article II, and those powers expire when that session expires. The Constitution simply does not textually permit the House and the Senate of a subsequent session of the General Assembly to take any further action on matters which the House or Senate of a prior session of the General Assembly may have begun, but not finished during that session, given that they are constitutionally distinct entities under Article II.[29] Accordingly, given these explicit constitutional constraints, we conclude that, when the House exercises its power of impeachment

---

[29] In this regard, it is irrelevant whether the impeachment power of the General Assembly can be categorized as judicial, as the Commonwealth Court concluded below, or legislative. The impeachment process concededly has both legislative and judicial aspects. The articles of impeachment, like ordinary legislation, are passed by a majority vote of the House of Representatives, and an ultimate judgment to convict or acquit in the Senate is also rendered by a vote of that body, which is in accordance with the manner in which legislation is ordinarily enacted. However, unlike with ordinary legislation, Article VI, Section 5, requires a two-thirds vote of the Senate to render a final decision, and that body sits as a jury to consider evidence presented to it by members of the House on whether the standard for impeachment and removal set forth in Article VI, Section 6 – "misbehavior in office" – has been established. Nevertheless, we need not definitively categorize this power for purposes of this decision, as, whatever its label, impeachment is, at its essence, the exercise of a power of the General Assembly conferred by our Constitution, and it, like all such powers of that body, endures only so long as our organic charter allows.

during one session of the General Assembly via the passage of articles of impeachment, trial on those articles must be held by the Senate of that session before it ends. [30]

This conclusion is reinforced by the manner in which the impeachment process is conducted. As in this case, articles of impeachment are passed by the House in the form of a simple legislative resolution, which is either approved or disapproved by the House via majority vote. As our Court has held, such a legislative resolution is generally regarded as "[a] formal expression of the opinion or will of an official body or a public assembly, adopted by vote." *McGinley v. Scott*, 164 A.2d 424, 430 (Pa. 1960). Thus, an impeachment resolution must be considered the formal expression of the opinion of the House of Representatives of the session of the General Assembly which passed it that the subject of the impeachment committed the acts described in the articles, as well as its opinion that those acts constituted misbehavior in office as that behavior is defined in Article VI, Section 6. In directing that the articles be transmitted to the Senate for trial thereon, such a resolution must also be considered an expression of the will of the *then-sitting* House of Representatives that the *then-sitting* Senate conduct a trial on the allegations contained in the articles.

---

[30] Our decision in *Griest*, *supra*., relied on by the Commonwealth Court, is not to the contrary. *Griest* simply did not address the question of the duration of the General Assembly's constitutional *power* to conduct impeachment proceedings; rather, it concerned the discrete question of the constitutional *process* the General Assembly was obligated to follow when passing a proposed constitutional amendment: the one provided in Article III governing the passage of ordinary legislation, or the separate process specially provided for by the amended article to the Constitution. Our Court concluded the latter was applicable. There was no issue in that case as to whether the General Assembly which passed the proposed amendment was constitutionally empowered by Article II, Section 4, to do so; thus, our analysis therein has no bearing on our resolution of this matter.

Likewise, resolutions adopted by the Senate for the purposes of conducting a trial on impeachment articles passed by the House of Representatives in a session of the General Assembly function as an expression of the collective will of the Senate of that session that a trial be conducted by that particular body in accordance with the terms therein. Given that, under Article II, a House impeachment resolution authorizing impeachment and the transmission of articles of impeachment to the Senate for trial, and a Senate resolution which accepts those articles for trial, expire with that session of the General Assembly, such resolutions can have no legal force and effect in a new session of the General Assembly whose membership has been altered by an intervening election and is now composed of both reelected and newly elected members.

Moreover, a contrary interpretation permitting one legislative body to direct the actions of a future legislative body could yield incongruous and legally impracticable results, such as indefinitely obligating any and all future sessions of the Senate to conduct a trial on impeachment articles once such articles have been passed by the House in a prior session of the General Assembly, no matter how long ago that passage may have been. Further, it would permit impeachment managers who are members of the House of Representatives, and appointed when such articles are first passed, to continue to serve indefinitely in that capacity to represent the House in a Senate trial during *any* future session of the General Assembly, even if it is no longer consistent with the will of the then-sitting House and, indeed, arguably, even if such managers are no longer duly elected members of that body.

That is precisely the type of incongruous result which threatens to transpire in this case, given that the Senate of the 206th Session of the General Assembly, before final

adjournment, issued a summons to the DA to appear for an impeachment trial that would, of necessity, occur in the Senate of the 207th Session of the General Assembly which had not yet come into existence. *See* S.R. 388. The composition of the 207th Senate differs from the 206th Senate in that it has 50 newly elected or reelected members, some of whom were not in office at the time the 206th Senate accepted the Articles of Impeachment for trial.[31] Moreover, if a trial were held by the 207th Senate, it would be conducted, under the terms of the Impeachment Resolution, by Impeachment Managers "on behalf of the House of Representatives." Impeachment Resolution at 50. This "House of Representatives" is the 206th House of Representatives, the one which approved the resolution, and it no longer exists; thus, there is no longer an entity which the Impeachment Managers can act "on behalf of" in an impeachment trial in the 207th Senate. We must reject an interpretation of our organic charter which permits such nonsensical results. As our Court has emphasized, "[c]onstitutional provisions, like all laws, must receive a sensible and reasonable construction." *Commonwealth v. Novak*, 150 A.2d 102, 109-10 (Pa. 1959); *Commonwealth v. Darcy*, 66 A.2d 663, 670 (Pa. 1949) (constitutional language should not be construed in a manner which will yield an unreasonable or absurd result).

For all of these reasons, we hold that the Articles of Impeachment passed by the House of Representatives of the 206th Session of the General Assembly, and transmitted to the Senate of the 206th Session of the General Assembly, became null and void upon the expiration of the 206th Session of the General Assembly on November 30, 2022.

---

[31] Similarly, the 207th House has 203 newly elected or reelected members.

Accordingly, we must reverse that portion of the order of the Commonwealth Court which denied the DA summary judgment relief on this question.

Order reversed in part.  Jurisdiction relinquished.

Justices Donohue and Wecht join the opinion.

Justice Wecht files a concurring opinion.

Justice Mundy files a concurring and dissenting opinion.

Justice Dougherty did not participate in the consideration or decision of this matter.

Justice Brobson did not participate in the decision of this matter.